Bernardo M. PEREZ

v.

**FEDERAL BUREAU OF INVESTIGATION et al.**

No. EP–87–CA–10.

United States District Court,
W.D. Texas,
El Paso Division.

Sept. 30, 1988.

On Issues Relative to Grand Jury
Subpoena Dec. 2, 1988.

As Amended Dec. 8, 1988.

On Motion for Protective Order
Feb. 7, 1989.

Antonio V. Silva, Silva, Silva & Herrera, P.C., Jose Angel Silva, Jr., El Paso, Tex., Hugo A. Rodriguez, Behlers & Davis, Albuquerque, N.M., for plaintiff.

Richard Greenberg, Herbert E. Forrest, Dept. of Justice Federal Programs Branch, Civil Div., Joseph R. Davis, Legal Counsel Div., F.B.I., Washington, D.C., Mollie S. Crosby, U.S. Attys. Office, El Paso, Tex., Lainie J. Simon, Civ. Branch, Alan L. Ferber, Trial Atty., Anne M. Gulyassy, Asst. Director, Federal Programs Branch, Civ. Div., U.S. Dept. of Justice, Felix A. Baxter, Steven L. Zelinger, Dept. of Justice, Civ. Div., Washington, D.C., for F.B.I., et al.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW BIFURCATED TRIAL: LIABILITY STAGE

BUNTON, Chief Judge.

BEFORE THIS COURT on August 15, 1988 came for trial the Plaintiff class consisting of 310 persons, present or one-time Special Agents of the Federal Bureau of Investigation, alleging that the FBI violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e–2 discriminating against Hispanic agents on the basis of their national origin.[1]

On Motion of the parties, the litigation was bifurcated into a "liability" stage to determine whether the Defendant has violated Title VII and a "recovery" stage to determine the eligibility of individual class members for compensatory relief.

## DOES TITLE VII APPLY TO THE FBI?

The Federal Bureau of Investigation is the arm of the United States Department of Justice that is responsible for investigat-

---

1. The trial took 9 trial days of approximately 9 hours each day. 98 witnesses appeared live; a number more through submitted depositions. Over 3500 exhibits were received at trial.

ing violations of Federal law.[2] Within its purview are foreign counterintelligence, terrorism, organized crime, drug interdiction (together with the Drug Enforcement administration), commercial currency crimes, and abductions. Among the FBI employees are approximately 9400 Special Agents; all of whom are members of the "excepted service."[3] However, the Congress has made clear that employees of executive branch agencies are subject to the requirements of Title VII:

"All personnel actions affecting employees or applicants for employment ... in executive agencies ... (including employees and applicants for employment who are paid from non-appropriated funds) ..., shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. Sec. 2000e-16(a).[4]

 Accordingly, the FBI is subject to the full reach of Title VII. Congress has demonstrated no intent to preclude judicial review of constitutional claims brought against the Bureau.[5] Elsewhere within Title VII of the Civil Rights Act Congress gives more detail as to what actions may be considered among "all personnel actions" of Section 717. Section 703 of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e-2, provides:

"(a) It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

With the exception of hiring practices, the Plaintiffs brought to this Court allegations which relate to every other element under the heading of unlawful employment practices; compensation, terms, conditions, or privileges of employment. In addition, Plaintiffs point to practices which limit, segregate, or classify employees which tend to deprive them of employment opportunities or otherwise adversely affect them.

The Court exercised control over the discovery process attempting to balance the Plaintiff's classmember's need for access to proof in support of their claims against the significant needs of the FBI and Justice Department for confidentiality and the protection of its methods, sources, and mission.[6]

## PLAINTIFF'S ALLEGATIONS

The Members of the Plaintiff Class (hereafter, "Plaintiffs") allege that practices of the FBI result in the selection of non-His-

---

**2.** 28 U.S.C. Sec. 531 et seq. The Bureau of Investigation in the Department of Justice was created administratively in 1908. By Executive Order No. 6166 of June 10, 1933, the investigative functions of the Bureau of Prohibitions were added to the functions of the Bureau of Investigation within the Department of Justice. By Act of Congress on March 22, 1935, Ch. 39 Title II, 49 Stat. 77 the Division of Investigation was designated the "Federal Bureau of Investigation" or "FBI" which name continues to this date. The Court considered printing a glossary of acronyms but decided to leave the reader to his own recognizance in this regard.

**3.** Employees of the FBI are outside or exempted from the classified civil service. See *Carter v. United States*, 407 F.2d 1238 (D.C.Cir.1968); 28 U.S.C. Sec. 536.

**4.** 1972 Amendments to the Civil Rights Act of 1964, Section 717, as amended, Title VII, 42 U.S.C. Sec. 2000e-16(a).

**5.** Where Congress intends to preclude judicial review of constitutional claims, its intent to do so must be clear. *Johnson v. Robison*, 415 U.S. 361, 373-374, 94 S.Ct. 1160, 1169, 39 L.Ed.2d 389 (1974); *Webster v. Doe*, — U.S. —, 108 S.Ct. 2047, 2054, 100 L.Ed.2d 632 (1988).

**6.** The Supreme Court recognized the District Court's "lassitude" to control the discovery process in *Webster v. Doe*, supra, — U.S. at —, 108 S.Ct. at 2054, involving a challenge by a discharged Central Intelligence Agency employee for alleged violations of the Administrative Procedure Act, First, Fourth, Fifth and Ninth Amendments.

panic agents for promotion, transfer, and other employment privileges in a manner which results in significant differences as compared to Hispanic agents. In particular, the plaintiff class alleges that impermissible considerations of ethnic heritage disfavor Hispanics for promotion, distribute temporary and permanent hardship assignments in a discriminatory manner, and apply disciplinary actions in unjustified proportions on Hispanic agents. Plaintiffs attribute the discriminatory effects to "disparate treatment" and "disparate impact" discrimination; that is, intentionally discriminatory acts and facially neutral policies and procedures of the Bureau which have adverse impact on members of a protected group. Anticipating the Defendant's defense, the Plaintiffs allege that the policies and practices of the Bureau are not justified by the business necessity defense. They further say that any proffered legitimate reason is but a pretext for impermissible considerations.

The Plaintiffs point to a promotion system which contains excessive subjective elements without procedures to evaluate the decisions for compliance with EEO guidelines. Similarly, the Plaintiffs claim that other employment decisions such as transfers, temporary duty assignments and discipline are excessively subjective and thereby capricious.

Plaintiffs also complain that members of the Bureau engage in "religious discrimination" against Hispanic agents for certain events not directly related to this action. In particular, the Plaintiffs allege that agents that are members of the Church of Latter Day Saints, colloquially termed "Mormons", engage in religious discrimination.

Further, at the time of trial, Plaintiffs complained of incidents of retaliation visited upon members of the class for their activities in support of the class.

Named Plaintiff Bernardo Perez, as an individual, claims that he suffered discriminatory treatment on the basis of his religious affiliation and national origin. In addition, he alleges that he was subjected to retaliation by the FBI for bringing a grievance under the Bureau Equal Employment Opportunity process.

## DEFENDANT'S CLAIMS

The Defendants deny the Plaintiff's claims and state that all assignments, promotions, transfers and failures to promote members of the Plaintiff Class were justified by business necessity in accordance with the mission of the FBI as a law enforcement entity. Defendants deny that any job related action suffered by Plaintiffs related to this litigation constituted reprisal or retaliation; rather, that disciplinary actions taken against Plaintiffs were motivated entirely by job-related factors.

Both Plaintiffs and Defendants agree that hiring practices of the FBI are not in issue in this action; that is, if the FBI violated Title VII of the civil rights act, its hiring practice would not be a *direct* legal cause of the violation. Thus, a person who claims that he was not hired by the FBI because of national origin discrimination could not be a member of the class in this suit.

## TWO PATHS CONVERGE

The Supreme Court distinguished two kinds of discrimination for the purpose of analyzing the evidentiary standards which trial courts are to apply to determine whether employment practices result in prohibited distinctions which harm employees. In "disparate treatment" cases, the plaintiff must prove that the defendant had a discriminatory intent or motive. See *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255, n. 8, 101 S.Ct. 1089, 1094–95, n. 8, 67 L.Ed.2d 207 (1981). The evidentiary burden shifts between the employee and the employer to determine whether, if discriminatory intent has been implicated, the employer can demonstrate that a legitimate nondiscriminatory reason motivated the adverse employment decision. The Supreme Court made clear at the close of its latest term that the burden shifting pattern is "only to aid courts and litigants in arranging the presentation of evidence: 'The ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all time with the plaintiff.' " *Watson v. Fort Worth Bank & Trust,* — U.S. —, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988), citing *Texas Department of Community Affairs,* and *United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).

■ In a second group of cases, the Supreme Court and Circuit Appellate Courts found a violation of Title VII without proof of "intentional" discrimination. See *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In these cases, facially neutral employment practices may be held to adversely impact on protected groups. The Court need not find that the employment practices were adopted by the employer with a discriminatory intent. These cases have been called "disparate impact" cases wherein the trial court is often treated to dueling experts who demonstrate statistical disparities rather than specific incidents of discrimination. In these cases, the distinction between "positive" and "normative" studies blurs; statisticians put on the hats of philosophers, economists, psychologists, and sociologists as they justify the underlying assumptions of their economic models, and their choice of statistical methodology, and they then offer competing explanations for those disparities.

■ The Supreme Court recognizes and this Court accepts the principle that no matter the characterization of these factual issues, the ultimate legal issue is consistent among the two broad types of cases: Did the employer (intentionally or not) adopt practices which impermissibly discriminate against persons? *Watson v. Fort Worth Bank & Trust,* — U.S. at —, 108 S.Ct. at 2785 citing with approval Justice Stevens' concurrence in *Washington v. Davis,* 426 U.S. 229, 253–254, 96 S.Ct. 2040, 2054, 48 L.Ed.2d 597 (1976).

This principle, that the ultimate legal issue for the purposes of Title VII is not susceptible to sharp compartmentalization, maintains a certain flexibility that responds to the historical pattern of employment practices. Practices which were once overtly discriminatory were transformed after the effective date of Title VII into diverse and more insidious policies which visited disproportionate affects on protected groups. See *Griggs v. Duke Power Co.,* 401 U.S. at 428–429, 91 S.Ct. at 852–853. Unfortunately, the setting of *Griggs* does not transfer well into a meaningful comparison with the case at bar. *Griggs* concerned the use of general aptitude tests and a high school diploma requirement which were not demonstrably related to the jobs for which they were used. The subjects of policies and practices before this Court are highly educated professionals; and unlike *Griggs,* the promotion system is awash in sophisticated subjective determinations.

Until the *Watson* ruling in the closing days of the Supreme Court's 1988 term, all of its "disparate impact" cases involved standardized employment tests or criteria. *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (written aptitude tests); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed. 597 (1976) (written test of verbal skills); *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (height and weight requirements); *New York City Transit Authority v. Beazer,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979) (rule against employing drug addicts); *Connecticut v. Teal,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982) (written examination). Watson represents an expanded use of disparate impact theory into the area of employment policies and procedures which contain subjective evaluation elements. Heretofore, courts could presume that valuative mechanisms which were not amenable to rigid, standardized criteria and required subjective elements must be analyzed under the disparate treatment analysis which required a finding of intentional discrimination.

Over the strong objection of the employer that subjective selection practices would be impossible to defend under disparate impact analysis, the Supreme Court reasoned that employment decisions based on

subjective employment criteria may have effects that violate Title VII even though they are neutral on their face and discriminatory animus cannot be easily proven. *Watson* —— U.S. at ——, 108 S.Ct. at 2786. There are two aspects of this finding which are especially relevant to the factual issues in the case at bar: (1) selection systems which combine "subjective" and "objective" criteria are generally "subjective" in nature; and (2) when discretion is delegated in an organization, there is a danger that the person designated to perform the key evaluation may act with discriminatory intent in a manner which violates Title VII.

## NATIONAL ORIGIN DISCRIMINATION

Throughout the litigation, there seemed to be some question as to what is an "Hispanic." Some witnesses seemed to consider it a racial distinction. One witness for the Defense, not a member of the class and carrying a surname of Northern European origin, stated that because of a Latin maternal ancestor he "liked to think that he was Hispanic." The implication of his testimony is that he had not felt discrimination and bore Hispanic class members no ill will. No class members were in doubt that their ethnic heritage was from Spain or of Spanish origin and the Defendant does not dispute whether any individual member possesses this quality. Some class members born in Latin American Countries and naturalized citizens are covered by the prohibition against national origin discrimination. The majority of the class members are native U.S. citizens; they are covered by the prohibition against ethnic origin discrimination. For the purposes of this class, the appellation "Hispanic" will signify ethnic and national origin categories.

■ The Bona Fide Occupation Qualification ("BFOQ") exception of Section 703(e) applies to all forms of discrimination prohibited by Title VII except racial discrimination. The exclusion of racial discrimination from the BFOQ results from a deliberate Congressional decision to prohibit all

racial classifications in employment. 42 U.S.C. Sec. 2000e–2(e)(1) (1982); 110 Cong. Rec. 2550, 7271 (1964). However, for cases where BFOQ is not in issue, the Courts seem to consider the two forms of discrimination, racial and ethnic, interchangeable and the prohibitions against each are substantially similar. See *Regents of the University of California v. Bakke*, 438 U.S. 265, 287–99, 98 S.Ct. 2733, 2046, 57 L.Ed.2d 750 (1978) (opinion of Powell, J); id. at 355–62 & n. 34, 98 S.Ct. at 2781–85 & n. 34 (opinion of Brennan, Marshall, White, Blackmun, JJ.); *Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944); *Hirabayashi v. United States*, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943).[7]

■ One other aspect of the question bears discussion. In *Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973) the Court held that the exclusion of Mexican *aliens* from employment at a manufacturing plant where 96 percent of the workers were *Hispanic* citizens of the United States did not violate Title VII. Thus, disparate treatment on the basis of alienage is not prohibited by Title VII and of course, no disparate impact upon Hispanic workers (U.S. citizens) at the plant existed. Alienage is not an issue before this Court in this cause.

## CLASS ACTION CLAIMS OF DISPARATE TREATMENT

It is not only disparate impact cases which involve the use of statistics. When a class of persons bring a claim of disparate treatment, typical evidence in support of the claims include class-wide statistics as well as numerous anecdotal accounts of disparate treatment. The anecdotal testimony provides the context by which to understand the statistical models. Conversely, the statistical picture provides a context by which to understand the detailed histories of class members. Similar to the axiom about the view of the "forest and the trees", each bears scrutiny and

---

**7.** Discrimination against persons of Japanese origin might also be discrimination against Asians. The opinion of the Court this day does

not rest on a close call of the BFOQ exception and thus, the distinction seems more theoretical than practical.

prudent persons constantly apply the lessons of one view to interpret the other. However, the two types of evidence are not equally probative of the presence or absence of discrimination.

■ The Supreme Court addressed the use of statistical analysis in support of allegations of disparate treatment in *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). *Hazelwood* concerned allegations of racial discrimination in hiring teachers by a public school district in the suburbs of St. Louis, Missouri. *Hazelwood* stands for the proposition that appropriate statistics compare the racial (or ethnic) composition of the general population, to that of the labor market, and then to that of the those hired by the school district, for the relevant period of inquiry. Thus, the labor market must be narrowed to only those persons with undisputed qualifications for the job. Another example of applicant-flow statistics is to examine those persons in the labor market who have actually expressed an interest in the job offered by the employer.

*Hazelwood* did not speak to the question of whether applicant-flow statistics and similar economic models are the best analytical tool in all circumstances. Though the limiting of the relevant pool appears meaningful, such an analysis does not take into account distortions in the proportion of minority applicants from such factors as deterrent effects of the very employment practice which is in dispute. Nor would such a model compensate for a combination of impermissible discriminatory policies and practices which act to narrow the applicant pool prior to the promotion decision which is alleged to be discriminatory. From *Hazelwood* to the Court's latest pronouncement, the Supreme Court left the need for applicant-flow statistics to be determined on the facts of each case. *Hazelwood*, 433 U.S. 299, 308 & n. 13, 97 S.Ct. 2736, 2741–42 & n. 13; *Watson,* —— U.S. at —— - ——, n. 3, 108 S.Ct. at 2789, n. 3.[8]

■ At no time has the Supreme Court advocated abdicating the legal analysis of causation and relevance to the statistical analysis of probable outcomes of one event, given one or more underlying conditions. This Court finds statistical summaries useful but limited. How useful? "Statistical disparities must be sufficiently substantial that they raise ... an inference of causation." *Watson,* —— U.S. at ——, 108 S.Ct. at 2789. The absence of a statistical disparity where the assumptions underlying the model are competent raises a rebuttable inference of no violation of Title VII. How limited? Precise numerical values are deceptive; they are only as descriptive as the accuracy of the assumptions which underlie the model.

■ The proper starting point is to determine whether the parties have identified the specific employment practice or practices which are in dispute. Most economic models cannot distinguish among practices which may involve great differences in *quality* among the choices. Thus, when applied to subjective evaluation mechanisms for promotional opportunities, statistics may do no more than indicate a pattern of deviation. The probative weight to give the statistical relationship is a matter for the fact finder. Thus, the magnitude of the deviation which is required and the import of any deviation demonstrated in the data are both legal determinations for the Court.

Though the Supreme Court has left the determination of the relevance and probative force of statistics to case-by-case analysis, it is clear that the District Court should be guided by the principle that the ultimate burden of proving that discrimination against a protected group has been caused by a specific employment practice remains with the Plaintiff at all times. *Watson* —— U.S. at ——, 108 S.Ct. at 2790. This is true of the probative weight to give to the Plaintiff's showing in support of its

---

**8.** "At least at this stage of the law's development, we believe that such a case-by-case approach properly reflects our recognition that statistics 'come in infinite variety and ... their usefulness depends on all of the surrounding facts and circumstances.' " *Watson* at n. 3 quoting from *Teamsters v. United States,* 431 U.S. 324, 340, 97 S.Ct. 1843, 1856–57, 52 L.Ed.2d 396 (1977) and referring specifically to the significance of numerical disparities on a case-by-case basis.

prima facie case and the Defendant's rebuttal. It is also true where Defendant attempts to demonstrate through statistics that a legitimate business reason is responsible for the disparate treatment allegation and that business necessity is responsible for the policy which has a disparate impact.

## CLASS ACTION CLAIMS OF DISPARATE IMPACT

As stated previously, the Supreme Court formulated the theory of disparate impact in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) whereby a violation of Title VII could be found without proof of intentional discrimination. If the Plaintiff proves disparate impact, usually by statistical evidence,[9] then the burden of production shifts to the defendant to prove that the employment practice is justified by "business necessity" or is "related to job performance." Id. at 431, 91 S.Ct. at 853. In both the disparate treatment and disparate impact pattern, the burden shifts back to the plaintiff to prove that the offered justification is a pretext for discrimination. *Albermarle Paper Co., v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975).

The burden shifting pattern just described is a formulation so reasonable in appearance that one might wonder how lawyers could find sufficient differences about which to argue. However, like the directions for assembling my grandson's model car, it is not as easy in practice as it appears on paper. Does the theory of disparate impact require a strong showing of business necessity or an effortless demonstration of relation to job performance?[10] Though scholars can argue whether the scope of "permissible disparate impact" is narrow or broad, perhaps the more helpful inquiry with regard to Defendant's rebuttal case is whether the showing of business necessity is a *meaningful* explanation which justifies distinguishing one person from another so as to slow but not derail Congress's intent in enacting Title VII.[11]

No matter the scope of the business necessity defense, the requirement of demonstrating a business necessity is a powerful tool to tear away the layers of subjective employment practices to evaluate persons for promotion. Subjective employment practices can mask intentional discrimination whether the evaluations are made by sophisticated executive officers or delegated to numerous mid-level managers. *Wat-*

---

9. The strength of the showing with regard to disparate impact statistics seems to be less than the strength of the showing of statistical disparities under disparate treatment allegations. *Watson* probably does not challenge this observation. However, *Watson,* insofar as it concerns subjective evaluation techniques for promotions, probably deemphasizes purely statistical deviations among the general population and the protected group. The focus remains on the appropriateness of the assumptions underlying the statistical model and whether the summary indicates a meaningful deviation.

10. *Griggs* could be understood both ways: "The touchstone is business necessity." *Griggs,* 401 U.S. at 431, 91 S.Ct. at 853. Then, in the next sentence, "[i]f an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." *Griggs* involved a high school diploma requirement and passing scores on two general intelligence tests for promotion to higher level departments, from which blacks had formerly been excluded entirely. Significantly, no black had been employed in the higher level departments until administrative proceedings

were begun leading to the *Griggs* litigation. *Griggs,* 401 U.S. at 427 & n. 2, 91 S.Ct. at 851–52 & n. 2.

11. The U.S. Supreme Court in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) stated that the objective of Congress in the enactment of Title VII was to achieve equality of employment opportunities and to remove barriers which operated in the past to favor an identifiable group of white employees over other employees, and that under the act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operated to "freeze" the status quo of prior discriminatory employment practices. The Court added that Congress did not intend to guarantee a job to every person regardless of qualifications, and hence, the Act does not command that any person be hired (or promoted) simply because he was formerly the subject of discrimination, or because he is a member of a minority group, but that it only proscribes discriminatory preference for any group, minority or majority. The removal of artificial, arbitrary, and unnecessary barriers to employment is required.

*son* signals the Supreme Court's willingness to bring undisciplined systems of subjective decision making under the scrutiny of Courts applying Title VII. *Watson,* —— U.S. at ——, 108 S.Ct. at 2785. Not every subjective evaluation system is implemented in a discriminatory manner. Not every statistical showing of significant disparities between the majority and protected group is convincingly explained by a policy which is required for the best operation of the business. However, occurring in combination, a Court would do well to perform intense scrutiny to determine whether a violation of Title VII occurred.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Procedural Posture

As stated above, this cause was brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec. 2000e–16.

Named Plaintiff Bernardo M. Perez became a Special Agent ("SA") with the FBI at the entry level of GS–10 on September 16, 1963. At the time this cause came to trial, Mr. Perez was an Assistant Special Agent in Charge ("ASAC"), at the level of GS16, at the FBI's El Paso, Texas, Field Office.[12]

On October 26, 1983, while acting as an ASAC at the FBI's Los Angeles, California, Field Office, Mr. Perez filed a formal Equal Employment Opportunity Commission ("EEOC") complaint of discrimination based on national origin. Later the discrimination claim was amended to add religious discrimination and reprisal for filing the grievance. On March 26, 1984, the FBI, through its designated Equal Employment Opportunity ("EEO") officer, notified

Perez of a proposed finding of "no discrimination." On April 17, 1984, Plaintiff requested a hearing before an EEOC Attorney–Examiner.

On January 15, 1984, Perez filed a second EEO complaint stemming from alleged reprisals. By September of 1984, a proposed disposition of "no discrimination" was issued and Perez again requested a hearing before an EEOC Attorney–Examiner. The two claims were consolidated for hearing. The final decision by the Department of Justice was returned on December 19, 1986 and rejected Perez's claims of reprisal and discrimination based on national origin and religion.

This suit was filed on January 16, 1987.

This Court has proper jurisdiction of the parties and the subject matter of this cause. The Plaintiff has exhausted all administrative remedies as to both the individual and class complaints.

This Court certified the class as to all past and present employees of the FBI. The evidence at trial supported this Court's findings in support of class certification with regard to numerousity, typicality, commonality and adequacy of representation.

### The Federal Bureau of Investigation

The Federal Bureau of Investigation is an agency organized under the Executive Branch of the Federal Government. The present Director is William S. Sessions.[13] At the time of trial of this cause, the Bureau numbered approximately 23,300 employees. Of that number, about 9,400 employees are "Special Agents," the professional staff who perform the investigative functions and staff nearly all of the management policy setting positions within the Bureau.[14] The 9400 Special Agents

---

**12.** At the time Mr. Perez filed this suit in January, 1987, he was the highest ranking Hispanic FBI agent. After the date of filing, a second Hispanic, not a member of the Plaintiff class, attained the rank of GS–16.

**13.** The Court limits the findings of this opinion with respect to Director Sessions at page 928. "The events ... did not occur on his watch. Director Sessions did not order, direct or personally participate in any discriminatory act."

**14.** Other staff members serve in technical and clerical support staff positions. The allegations in this cause are brought by only Special Agents. The Court's findings do not encompass employment conditions or promotional practices with respect of employees who are not Special Agents.

staff 58 field offices, 400 Resident Agencies [15], 14 Legal Attaches ("Legates") in foreign countries, and training and administrative facilities located in Washington D.C.

The FBI is known as the "investigative arm" of the United States Department of Justice (hereafter "DOJ"). Though the FBI is autonomous with regard to most of the practices at issue in this cause, the Department of Justice, through its Office of Professional Responsibility, reviews administrative disciplinary investigations conducted by the Bureau of some high level Special Agents and makes decisions binding on the Bureau with respect to the administrative actions.

At FBI Headquarters, there are three broad divisions, each headed by an Executive Assistant Director: Law Enforcement Services, Investigations and Administration.[16] The top level professional staff within these three divisions are Special Agents who have spent their entire professional career within the Bureau. With the exception of clerical support staff, most "headquarter" positions are supervisory or "management level" positions at the Bureau. Typically, the assignment of a Special Agent to Washington represents career advancement under the Bureau Career Development Program (CDP), the promotional ladder within the Bureau. Though there are supervisory positions at each field office and Legate, "brick agents" or street agents do not get the nod to go to FBI Headquarters unless they are promoted to supervisor as part of their transfer or comparatively soon after arriving.

After entering the bureau, Special Agents are normally promoted from Grade 10 to Grade 11 after two years of competent service; from Grade 11 to Grade 12 after two more years; and from Grade 12 to Grade 13 after completion of three successful years at Grade 12. Management ranks begin at Grade 14. At trial and beyond, the Defendant did not concede the existence of an "accelerated promotion" program whereby agents who are selected for Headquarter assignments receive promotions at a faster rate into supervisory levels and thereafter, though some witnesses called by Defendant admitted to the practice. The preponderance of the evidence demonstrated a policy and practice of promoting agents assigned to Headquarters ahead of peers in field offices.

At Headquarters, from the second most top level working down, positions along the hierarchy are named Assistant Directors, Deputy Assistant Directors, Section Chiefs, Assistant Section Chiefs, Unit Chiefs, and Supervisory Special Agents.

At the field offices, the highest ranking Special Agent is the Special Agent in Charge ("SAC").[17] The SAC is assisted by one or more Assistant Special Agents in Charge ("ASAC"), Field Supervisors, Supervisory Senior Resident Agents, Relief Supervisors, and Investigative Special Agents.

*Utilization of Spanish Language Skills*

A starting point to understanding the interplay of duty assignments, conditions of employment, and the promotional practices in the Bureau is an examination of the Bureau practice for utilization of the Spanish language skills of its agents.[18]

It is significant to the Court that there developed at trial a significant difference between policy and practice at the Bureau with regard to the treatment of persons

---

**15.** Satellite offices to a field offices. The agents in these offices are under the administrative authority of the field office Special Agent in Charge.

**16.** All offices within the Bureau relating to the many functions of investigative work assigned to the Bureau report to one or more of these three divisions save the offices of Legal Counsel and Inspection Divisions which report directly to the Director.

**17.** One exception to the designation of field office management staff is the New York Office. The New York office is headed by an Assistant Director, Deputy Assistant Director, and 3 SACs for Criminal, Foreign Counter-intelligence, and Administration.

**18.** Those allegations relating to religious discrimination and retaliation are distinct from Plaintiff's allegations relating to language skill.

who possess language skills. These differences are at the heart of Plaintiffs' claim.

In theory, Special Agents enter the Bureau through one of five programs or categories which they designate by election. Those categories are Law, Language, Science, Accounting or Diversified. The Diversified category, also known as the "Modified" program, admits candidates who otherwise meet Bureau education requirements and have some prior professional or experiential background which the Bureau can utilize or develop through training to assist the Bureau. Still at the level of theory, the Bureau policy is that an agent's skills, ability and expertise *for which he or she was hired* may be used by the Bureau at any and all times during a Bureau career. Candidates are informed of the Bureau's prerogative in this regard at the time of their entrance into the Bureau.

In practice, with respect to some abilities and skills, particularly ability in the Spanish language, the utilization of these skills is particularly burdensome on agents and significantly affect in an adverse manner the conditions of employment and promotional opportunities. Some of the related allegations of the Plaintiff concern: the manner in which these skills are identified for use by the Bureau; the presumption that the skill will be utilized by agents who entered the Bureau under a skill program other than language; and the implications for career advancement for the agent whose Spanish ability is utilized on a regular basis.

The Personnel Director of the Bureau testified that Special Agents who qualify as a lawyer but who have a language ability need not take a language exam. This view was echoed by other top officials. The

consensus among management is that Bureau Special Agents cannot be forced to take a language test. Under that principle, an agent who enters under the accountant or law qualification, or under the modified program[19] could not be forced to take a language exam. At the time of trial, officers of the Bureau with supervisory responsibility over these areas testified that they did not know of any person who was forced to take the language exam. Their belief was that all persons are given the language exam; anyone may refuse to take it. The evidence heard at trial does not support this view as to Hispanic agents. The Court finds that a significant number of Hispanic agents were ordered to take the exam on threat of insubordination. No person outside the protected group faced similar requirements. Other Hispanic agents were simply given the exam; no Hispanic agent testified to knowledge of the opportunity to refuse the exam. The Defendant did not rebut this claim.

Similarly, though management expressed its view that the Bureau cannot force persons who enter under an alternate qualification program to monitor Spanish language wiretaps, the preponderance of the evidence received at trial established that Hispanic agents from any classification have been called to monitor Spanish language wiretaps.[20]

With respect to distinctions within the linguistic qualification category, the stated policy of the Bureau is to make no distinction between "native speakers" and "learned speakers." All linguists must sign a "contract" or affirmation that the Bureau can rely on their language skill and make assignments throughout their career based on their skill.[21] The Bureau main-

**19.** One exception is a person whose prior professional experience was a Spanish linguist; these persons would enter as a Spanish linguist.

**20.** The Personnel Director demonstrated the inconsistency of the application of the principle himself. When asked why a particular Hispanic Special Agent in Chicago who qualified under the accountant program could be forced to sit on Title III wiretaps, he responded that "she volunteered ... or showed proficiency."

**21.** FBI Form 3–26, para 5 is affirmed by Special Agents upon appointment: "[t]hat if [his] appointment is based on particular skills or abilities that [he] might have in disciplines such as law, accounting, language, science, engineering or any other special expertise, [he] may be required to use it intermittently or continuously throughout [his] employment, based upon the needs of the [FBI] and at any duty station where they are required."

tains that the "needs of the Bureau" require that the Bureau can call upon agents at any time in their career to perform the special skill for which they were hired by the Bureau and that this requirement is a legitimate, nondiscriminatory reason for employment decisions made exclusively on the basis of an agent's language skill and that this is a "business necessity" within the meaning of Title VII case law. The evidence at trial demonstrated that Spanish speaking Hispanic agents who enter the Bureau under another specialty who are ostensibly *not* subject to the skills use requirement as to language, nonetheless are used for the same purposes.

The Defendant, through its officers, tendered the argument that there is a distinction between a superior informally calling on the language skills of an agent and the Bureau "officially" using that skill, meaning that the superior may be permitted to do that which the employer cannot do. However, from the standpoint of Title VII law and the findings of this Court, it is a distinction without a difference. The practice of informally selecting the skills of Hispanic Spanish speakers who entered under an alternate program other than language is so widespread a practice that it is a policy of the Bureau.

As to those persons, Anglo and Hispanic, who enter as language specialists and sign the contract, whether the Bureau will equally rely on the language skills of "native speakers" (predominantly Hispanic) and "learned speakers" (both Hispanic and Anglo) is hotly contested.[22] It appears to the Court that with regard to Hispanics, the Bureau does not distinguish between learned and native speakers; their language skills are used in far greater proportion than Anglo counterparts in every category; undercover assignments, witness interviews, and Title III wiretaps.[23] The Bureau makes no formal distinction between learned and native speakers; however, in practice, Anglos who acquire Spanish language proficiency voluntarily "opt out" and are relieved from assignments made in reliance on the language skill. No similar opportunity has been given Hispanic agents. The Court finds that Hispanic Special Agents, be they learned or native speakers, are assigned to Spanish language wiretaps in proportion significantly greater than Anglo Spanish speaking counterparts.

The practice of the Bureau of utilization of Spanish language skills of its agents evolved over time. The systematic discrimination identified in these findings probably did not begin as intentional bias. It appears that during the 1960's and early 70's, when Hispanic agents entered under an alternate qualification program than language, it was presumed that (1) they spoke Spanish and (2) they were amenable to using their abilities for the Bureau. One example of a common pattern is one agent member of the Plaintiff class, after becoming a Special Agent, who was asked informally whether he knew Spanish. He entered under the "modified program" in the late 1960's. After responding that he had some minimal Spanish speaking ability, he was called upon regularly to do translations and Title III wiretap assignments over many years. In 1984, the agent was asked to take a Spanish exam. He was tested over the phone and determined to be proficient. There was no notice to him that he could refuse to take the exam. The same agent stated that he is not proficient in Spanish, cannot conduct hostile interviews, and cannot write the language.

Some Special Agents within the class testified that it was not made known to them the category assigned to them upon their entry into the Bureau. Many agents in Plaintiff class were under a misapprehension as to their classification. A com-

---

**22.** Witnesses did not use the terms "native" and "learned" speakers in a consistent manner. However, for the purposes of these findings, a native speaker is one who learned the language outside of the academic environment in one's early years. A "learned" Spanish speaker most often learned the language in formal education. Some persons received their language training by the Bureau during their career with the Bureau; these persons are also "learned" speakers.

**23.** One exception which bears mentioning is assignment to Foreign diplomatic posts for which the Court finds that Hispanics are under-assigned in significant numbers.

mon pattern is that some believed that they entered under a "diversified" or "modified" program reflecting a liberal arts education and some professional experience in military service, police, or business. However, during the process of discovery for this civil litigation, some agents who examined their personnel files learned that they were classified under the language program along with, or in the place of, their expected classification. It was not uncommon for agents to discover they had qualified under two programs—one for their profession and the other based on their language skill. One class member who graduated high in his class at a prominent law school and is a member of the California bar found upon review of his file that he had entered under law, modified, and minority programs. He took the Spanish exam by order of his superiors and has served primarily on Spanish language special assignments and wiretaps since taking the language test. He testified that he could not translate written Spanish to English and possesses only a rudimentary knowledge of simple Spanish conversation. The agent testified that he has applied for nine (9) in-service training programs and received none in (6) years with the Bureau; "[t]his reflects a Bureau attitude that Hispanics are not qualified for those experiences which can make them upwardly mobile." The same agent, by way of illustration that he had not been considered for promotion on the basis of his legal abilities, noted that one of his classmates who entered the Bureau was sitting at the Defense table assisting the Defense of the case in her capacity as Special Agent assigned to legal division at headquarters. The illustration is not dispositive of an individual claim of discrimination; however, together with other accounts, it supports this Court's decision to discount the significance of entry classifications and focus rather on treatment of employees within and without the Bureau's entry level program classifications.

While class members who qualified under an alternate plan than language were selected for testing in the Spanish language, Anglo counterparts were not tested for language skills.[24] The testing was not voluntary; failure to submit to the testing would be sanctioned formally or informally. Defendant did not refute the clear implication of the evidence that only Hispanic surname agents were selected for the testing. The presumption of the Bureau that not enough non-Hispanic agents have a second language skill to justify testing every agent, in the context of the Bureau's insistence that the vital interests of the Bureau's mission require the skill, is inconsistent and undercuts Defendant's argument that disparities can be justified by reasons of business necessity.[25]

For the tests given to Plaintiff class members who did not enter the Bureau under the language category, the test results are highly suspect. Many of these tests were given by oral conversation exams conducted over the phone and lasting fifteen minutes or less. Some agents who failed a written exam were ordered on threat of insubordination to retake the written exam until a passing grade was achieved. The Hispanic Special Agents who were selected for testing were already qualified into the Bureau under another classification. Once tested, Hispanic agents were assigned regularly to special duties such as wiretaps, undercover assignments, special duties, and duty station transfers based on their language skills. Some class members testified to their low functioning in Spanish language, and that the testing methods (oral telephonic exams) incorrectly evaluated their skills at a higher level. These agents' objections to the accuracy of their language rating went unheeded.

**24.** Public school education in the United States for some time has educated students in foreign languages. Many non-Hispanic citizens are exposed to language skills in the course of their home environment, school setting or work experiences. The Bureau has not required testing of all of its agents for foreign language skills.

**25.** Any reason offered by the Bureau to forego testing Anglos would apply equally to Hispanics: "there is no incentive for an agent to admit a Spanish speaking proficiency; some will hide their ability."

■ The Court finds that on the basis of Hispanic surname or other selection based on the agent's national origin, the Bureau singled out agents to take the language skills test and made assignments significantly affecting their conditions of employment in an adverse manner. The Court further finds that no similar presumption attached to non-Hispanic agents.

Though the Defendant attaches significance to the fact that Special Agents who possess special skills should be expected to use them to further the mission of the Bureau, the burden of that requirement falls disproportionately on Hispanic agents.

Plaintiff class members testified to their personal knowledge that non-Hispanic Spanish linguists had stated their preference to be relieved of their requirement to use the Spanish language in the course of their duties after a period of three to five years utilizing the language. Defendant's pointing out that most Hispanic agents had not made such a request is not convincing.[26] The evidence demonstrated that the practice of the Bureau is to place the weight of deplored assignments on Hispanic Special Agents. Whereas Anglos are relieved from the requirement of using their language skills and focus on other skills which would enhance promotional prospects, the same opportunity is denied Hispanic agents. The preponderance of the evidence demonstrated that Anglo linguists, whether trained by the Bureau or entering the Bureau with their language skill, are not utilized for unpopular assignments in significantly disparate amount, and Anglos may be relieved of the burden of using the language skill in the regular course of their employment—an opportunity not equally available to the Plaintiff class members.

### "Minority" Program Hiring

Defendants did not offer evidence in support of a theme they interjected on cross examination: that some Hispanic agents who enter under a "minority" entry program are required to meet lower standards. The theme invites this Court to find that "minorities" who substantially meet the same rigorous requirements as Anglo applicants are not full peers for the purpose of employee benefits, conditions of employment, and promotion. It follows, under this argument, that the Bureau could impose different conditions of employment between minority applicants and non-minority because in fact there are two classes of agents with a different employment relationship to the Bureau.

■ However, no officer of the FBI testified that there exists two classes of Special Agents or a policy distinguishing promotional opportunities or conditions of employment between minority program Special Agents and others. Witnesses at the top level of the promotional pyramid denied that there is any two tier program, that linguists are not eligible for promotion, or that Hispanics are promoted less often. There was no direct evidence of the presence of a "minority" hiring program, or that Hispanic agents are judged by different standards. Further, there was no evidence that lower standards would result in hiring of Hispanic Special Agents who could not match their Anglo peers in every category necessary to the Bureau's mission. This Court does not find credible the implication that some members of the Plaintiff class entered the Bureau as "second class" agents and that disparate conditions of employment, expectations for their duties, or promotional decisions could be made in some function of the manner of their entry. The evidence does not support it. The proposition is inconsistent with other positions taken by the Defendant through its Assistant Directors.[27]

---

26. At least one Plaintiff agent testified that his written request had been ignored; several class members testified to informal requests which were ignored by superiors.

27. The Director of Personnel stated that entering the Bureau under a language program is no barrier to normal promotion within the bureau.

The Personnel Director is an example of a language specialist who has risen within the Bureau. His specialty is not Spanish language. Despite his language ability, he has been under no requirement to keep current in the language. He stated that not appearing Serbo Croation did not hurt his performance during the one year he

### Spanish Speaking Agent's Duty Assignments

The discussion of language skill qualification becomes significant in relation to the duty assignments made to Spanish speaking Special Agents and the result of these assignments on promotional opportunities. Hispanic agents who speak Spanish, whether they be language specialists or qualified under another program, such as law or accounting have been used in disproportionate numbers to perform Title III wiretaps.[28] The wiretaps involve long periods from 8–12 hours during which an agent is confined or secreted in a vehicle or room listening to conversations made over a telephone. When a judgment is made in the course of an investigation that the wiretap may involve some conversations in the Spanish language, then FBI practice is to assign a Spanish speaking agent to monitor the wiretap.

A wiretap is extremely difficult for the persons involved. Among the reasons the duty is difficult are these factors:

1. Shifts are long, often 12 hours in duration and movement is restricted.

2. A common assignment involves rotations of "12 hours on and 12 hours off", 30 to 90 day assignments.

3. The duty is not voluntary. Agents are assigned to the duty without regard to their present assignments or other duty.[29]

4. Agents assigned to Title III wiretaps are taken off of the active cases they have developed. Their own cases are reassigned to other agents and not returned to the agent who monitored the wiretap at the conclusion of the assignment.

5. Title III wiretap assignments often take an agent away from his or her home office. Agents travel away from their families for long periods.

The Court finds by the great weight and preponderance of the evidence that: (1) Hispanic agents suffer disparate treatment in the conditions of their employment; and (2) these conditions affect their promotional opportunities in an adverse manner.

The Defendant introduced evidence that current assignment rosters reflect that Spanish speaking agents, both Anglo and Hispanic, are similarly available and assigned to these wiretaps. However, not one Anglo agent appeared and testified that his Spanish language skills have been used in a similar manner on Title III wiretap duty. On the contrary, Hispanic agent after agent testified they *have never seen an Anglo Spanish speaker on a Title III wiretap assignment in their career.* Class members testified to the existence of a widely recognized "Taco Circuit" or "Tortilla Circuit" whereby Hispanic Spanish speaking agents were regularly chosen for 30 to 90 day assignments doing wiretap duty. They shared this duty with other Hispanic Spanish speaking agents. They saw the same faces and conspicuously did not see Anglo Spanish speakers. Some witnesses had performed 20 to 25 wiretaps lasting a minimum of 30 days each never observing one non-Hispanic sharing similar duty. Hispanic agents who qualified under the accountant and lawyer programs are not immune from assignment to wiretaps for significant periods at significant frequency. Agents testified that a widely used aphorism in the Bureau is "[other than Hispanic language specialist Special Agents,] only Hispanic accountants and only Hispanic lawyers sit on wiretaps."

used his language skills in investigatory assignments. He does not expect that he will be asked again to use his specialty.

**28.** These wiretaps are authorized by a Magistrate or Judge pursuant to 18 U.S.C. 2516.

**29.** The clerical person who administers the Bureau program testified that a Spanish speaking agent's superior is contacted directly and advised of the pending special duty transfer for the agent. There is an opportunity for the superior to object to the use of one of his agents for the special duty. The supervisor's objection can be countermanded by higher authority. In any event, wiretaps for which no travel is required are assigned within the field office of the agent without statistical accounting in headquarters of the duty. These home office wiretap duties place the same burdens on an agent as listed in the text with the exception of number 5, below.

## Implications For Promotion

The Spanish language wiretap duty has a marked and significant effect on the promotional opportunities of Hispanic agents. An agent whose cases are reassigned cannot "collect the ticket" when the investigation bears fruit. Other agents compile a long record over years of successful operations as the Hispanic linguist performing frequent temporary duty assignments receives letters of appreciation but fewer successes on the important indices which lead to promotion, closed cases and informant development.

The fact that an individual is given positive recommendations by his superior alone does not effectively refute an allegation that a person has suffered an adverse employment condition or that he has not suffered discrimination in employment. Testimony throughout trial demonstrated that small differences and nuances in subjective evaluations have great significance for the true import of an evaluation. Discriminatory animus is elusive; Title VII analysis focuses on the effects of prohibited discrimination and permits this Court, upon consideration of the entire record, to infer the cause.

An agent who travels the "Taco Circuit" is often unavailable when special training opportunities arise. These valuable Hispanic linguists are passed over for in-service training or career development opportunities because their skills are needed more in Spanish language related assignments. As a result, Hispanic agents are not exposed to the managers who make the subjective evaluations and determinations for career advancement. Hispanic agents do not gain similar professional experience of Anglo peers, experiences which are necessary to advancement. A frequent complaint supported by the preponderance of the evidence is that an Hispanic agent with five (5) years of Bureau tenure who has ridden the "Taco Circuit" may not have the experience of an Anglo on duty for two years. This is a distinction which is significant to promotional opportunities in the manner in which the FBI determines career advancement. The Court finds that Title III wiretaps and other language related temporary duty assignments are not rewarded by promotion or other conditions of employment in a manner which reflects the importance of their contribution to the mission of the FBI.

## Business Necessity

■ The Bureau argues that requiring agents who have Spanish language skill to utilize the skill at any time is job-related and necessary to the mission of the FBI; the national drug problem has caught the Bureau with a severe shortage of agents with skill in the Spanish language. However, this defense does not permit the Bureau to visit the burdens of Spanish language duty in a disparate manner on Hispanics over non-Hispanics. Nor does business necessity justify benefit and promotion systems which do not reward Hispanic agents in a manner commensurate with their admitted contribution to the Bureau. The protection of the public safety and welfare does not justify the discriminatory practices demonstrated at trial. Corrections in these systems should not seriously jeopardize the effectiveness and success of the FBI in its law enforcement effort.[30]

There was evidence which supported the view that some temporary duty assignments for which an Hispanic is specifically requested are not substantially related to the work that is required. The Bureau has no review mechanism by which one supervisor's request for an Hispanic is examined to determine the use of the language skill; interview, undercover, or wiretap monitoring. It is never asked whether Spanish language is to be used at all, on occasion, or throughout the duty. Evidence demonstrated that class members were assigned

---

**30.** The appearance of unfair employment practices at the Bureau—in several respects found by this Court to be supported by the evidence—may have the effect of driving agents who possess this critical language skill away from the Bureau and prevent qualified persons who possess these skills from choosing a career in the Bureau. Seen in this way, "business necessity" is better met by eradicating those employment practices which violate Title VII.

in significant numbers to temporary duty assignments. This takes an agent away from his own case load, home office, and family environment, and Spanish speaking ability is not always required by the nature of the assignment. To justify the effects of the disparate employment conditions, the Bureau must develop a valuative and review mechanism whereby a substantial relationship exists between the special duty assignment which is necessary to the mission of the Bureau and the hardship on the officer. Such a review mechanism does not exist. Hispanic class members suffered disparate conditions of employment in this regard without a showing of justification of business necessity in violation of Title VII.

### Undercover Assignments

Plaintiffs allege that Hispanics perform undercover assignments in disproportionate amounts and that undercover operations are not voluntary but a requirement of their employment. That Hispanics are better in undercover work by virtue of their appearance appears to be a self-evident proposition. However, the Defendant has not demonstrated by study or testimony the truth of this proposition. A competent study comparing professional investigative techniques in the area of drug interdiction may demonstrate a significant relationship between assignment of Hispanic agents to undercover work in disparate proportions to the important goals of the Bureau. It is equally possible that the hidden presumption is that non-Hispanic agents are not expected to alter their appearance and manners to take on the persona of Anglo criminal elements engaging in the same undercover drug purchases and contacts. Presumably, some non-Hispanic Americans are dealing with Latin American drug suppliers in significant numbers and thus, there is no basis to presume, without examination, that the bulk of undercover drug investigative assignments should be borne by Hispanic agents.

■ Though the FBI's assignment system contains some degree of coercion, Title VII does not require that assignments be made on a voluntary basis as the system is advertised. The appropriate inquiry is whether or not the undercover assignment system creates a condition of employment that is borne more heavily by Plaintiff class members. Does this system have effects on promotion or benefit assignments which distinguish between persons on impermissible grounds?

■ One could imagine a system whereby tall persons or strong persons are requested to shoulder heavier burdens. This does not unfairly discriminate against tall and strong persons over short and weak persons unless tall and strong persons are not compensated in some manner for their greater contribution and the very reason they are not compensated is that the employer has an irrational bias against these persons. Title VII is implicated when the greater burden is shouldered by members of a protected group and unfair promotion or benefit distribution, by the preponderance of the evidence, is shown to be significant, pervasive, and not justified by business necessity.

■ The Court finds that the contribution of both mono-lingual Hispanic agents and bilingual Hispanic agents in undercover work is not rewarded by benefits and promotion. Although the Bureau has articulated a business necessity supporting the assignment of Hispanic agents to undercover work in statistically disproportionate manner, the Plaintiffs have demonstrated that the contribution of Hispanic agents does not translate into employment benefits. On the entire record introduced at trial, the Court finds that this disparity—in benefits and promotional opportunities—is not justified by reasons of business necessity.

■ An appropriate remedy which satisfies Title VII may not require that certain agents be promoted into positions where their skills are not used by the Bureau. Recognition can be given in other terms. A promotional system may be devised which keeps agents uniquely qualified to

further the FBI mission in the field yet at higher grade or benefit level.[31]

■ Though Title VII may not prohibit the Bureau from assigning Hispanic Special Agents to undercover work in disproportionate numbers, Title VII does prohibit the Bureau from failing to credit adequately the contribution of the undercover agent to the mission of the Bureau in terms of promotions and benefits. The record is replete with stories of successful short term and long term undercover assignments for which the Hispanic agent performing the duty perceives that his work did not translate into promotion while non-Hispanic agents who "have the ticket" on the case [32] receive career benefits for their work. Defendants, by way of rebuttal, offered evidence of letters of commendation given to undercover Hispanic Special Agents. Plaintiffs allege that no credit is given on their evaluations in a meaningful manner which translates into promotions. Upon review of the entire record, the Court finds credible the view of Plaintiffs that the Bureau's evaluation of the contribution of Hispanic agents on undercover assignments, not the fact of making undercover assignments, violates Title VII's prohibition against discrimination of members of protected groups for promotion and benefits.

Defendants maintained at all times that undercover assignments, special duty assignments, and routine assistance for fellow agents on an informal basis are all "voluntary" decisions; the person to whom an inquiry is made may refuse to take the assignment with no adverse result. Plaintiffs offered evidence that while the nature of the FBI mission exerts pressure on all agents to accept assignments, they are not strictly voluntary; thus the burdens fall most heavily on Hispanic agents.

Plaintiffs argue that refusing an assignment, or refusing to assist fellow agents when asked, will reflect badly on periodic evaluations of the agent. Refusal transfers into evaluations whereby the agent is judged "not aggressive", or "not dedicated." Such an evaluation has a significant negative impact on an agent's career.

*Ad hoc Investigatory Assistance*

Class members testified to numerous incidents where they were asked to assist supervisors or fellow agents by performing translations, conducting Spanish language interviews, or accompanying non-Spanish speaking agents on field assignments. On these occasions, though the Spanish speaking agent assists and performs necessary paperwork involving translations, the "ticket" on the case is held by the mono-lingual agent who requested the assistance. The class member's contribution is not recognized in a manner which leads to promotion; the administrative statistical profile. Gratitude of a fellow agent does not make up for the disruption in the helping agent's case work. From this pattern came the term "Anglo helper" which testimony demonstrated is in wide, though informal, use throughout the Bureau. Class members from every qualifying classification, attorney, accountant, modified, and linguist testified that they were expected to perform this assistance in significant amounts. Defendants did not introduce evidence that the burden of performing translation assistance was borne equally by Anglo Spanish speakers.

The Court finds that because of the manner in which contribution is measured in the Bureau, the evaluation mechanisms do not significantly account for the contribution of members of Plaintiff class who perform the ad hoc translation assistance.[33]

---

**31.** See the Court's discussion on page 917; "[t]he accelerated promotion system putting lawyers and accountants in manager positions at higher compensation while not similarly recognizing the 'vital' contribution of bilingual Special Agents violates Title VII and cannot be refuted by resort to 'business necessity'."

**32.** An agent who "has the ticket" on the case is the agent who is the person who will get the

evaluative credit for the success of the investigation; most often the person who manages the administrative part of the investigation.

**33.** Again, the informal or formal expectation of the Bureau that Hispanic Spanish speaking agents will assist a fellow agent in any manner, itself, does not violate Title VII.

### The Needs of the Bureau

 The phrase "needs of the bureau" was often intoned by Defendant witnesses to explain policies which require personal sacrifice on the part of Special Agents for the convenience of Bureau activities. No document of the Bureau memorializes the meaning of "needs of the Bureau." This lack of precision is not fatal to the concept from the perspective of Title VII. However, the phrase is not prophylactic of all policies of the Bureau, or of decisions made by supervisors in the Bureau exercising their discretionary authority. The witnesses for the Defendant seemed to use the term as a self-justifying proposition.[34] This Court will define the "needs of the Bureau" inversely; those things which the law forbids cannot be within those policies for which "needs of the bureau" is sufficient justification.[35]

 Though the findings of the Court with respect to Plaintiff's central allegations, taken together, is a limitation as a matter of law on the scope of the needs of the Bureau, the following specific findings are made: The "needs of the Bureau" could not include keeping files on agent's family members engaging in first amendment protected activity.[36]

The "needs of the Bureau" is often recited to justify transfers of agents, one of the most vitriolic issues for Plaintiff class members. Though as a matter of policy all transfers are made strictly on the basis of the needs of the Bureau, in fact, personal needs of agents are taken into consideration routinely and the transfer system is highly susceptible to bargaining with superiors and subjective determinations. Also, to the extent that the requirement to go where one is assigned is a condition of employment, there is the possibility that the weight of certain "hardship" transfers may be visited in an unfair manner.[37] Thus, whether transfers are applied unevenly is subject to scrutiny to determine whether there is a pattern and practice of discrimination.

 The Bureau has devoted significant administrative resources to easing the burdens associated with field offices where the cost of living is high or conditions are dangerous for agents and their families. The Court is of the opinion that the "needs of the Bureau", that is, business necessity for the purposes of Title VII, permits a disproportionately high transfer rate of Hispanic Spanish language Special Agents to places where they are needed so long as the transfer does not result in uncompensated burdens in terms of conditions of employment or causes one to forego promotional opportunities. The transfer system is a subjective system which is susceptible to invidious distinctions or favoritism of persons who "have the right connections." In the second part of this bifurcated proceeding, the Court will revisit the issue of transfers and whether the Bureau can devise a system of transfers which is subject to systematic review within the Bureau. As a matter of prudence, the Bureau is working to accomplish "fairness" in its transfer program. The record does not support specific findings of violation of Title VII on the issue of transfers of Hispanic agents.

Plaintiff class members, in support of their allegation that members of the Bu-

---

**34.** Q: Why is the policy necessary? A: because of the needs of the Bureau. Q: Why does the Bureau have this need? A: It is a necessary policy.

**35.** Clearly, The Fourth Amendment is a limit to the principle of the "needs of the Bureau." An arrest which involves excessive force could not be justified by "the needs of the Bureau." Similarly, Title VII is a limit to the meaning of the "needs of the Bureau."

**36.** One agent testified that he was transferred because his wife was engaged in local communi-

ty work which involved a somewhat adversarial relationship between her Rape Crisis Center and the local police department. Newspaper articles were collected by the class member agent's superiors and placed in a "sub file" and sent to the agent's new superior officers at the transfer office. The Court does not make a specific finding of violation of Title VII on this incident.

**37.** Among the most difficult assignments for a Special Agent is transfer to the San Juan field office. The Court, hereafter, at page 923, fn. 54–55, describes some of the difficult conditions under which Special Agents must work.

reau were motivated by discriminatory animus, offered anecdotal evidence on the subject of a preoccupation by Bureau with the appearance of Hispanic agents. An Hispanic woman in training was told she "looked too ethnic." Hispanics picked to represent the Bureau at a LULAC convention were picked according to whether they were not "too dark" or "too Hispanic looking." It is beyond dispute that agents are chosen for certain undercover work according to their ability to portray a criminal element in a largely Hispanic populated community or region.

 It appears to the Court that there is a preoccupation in the FBI with the proper image to represent the Bureau to the public and further the investigative mission of the Bureau. The Court points out that any policy or practice of the Bureau and its officers distinguishing persons on their appearance must "significantly serve" the interests of the Bureau. Thus, in this eclectic era, neat and professional appearance does not require a non "ethnic" appearance. Of course, the Bureau, under the requirements of Title VII should not assign agents to coveted public relation duties according to whether a person appears "too Hispanic" or not. However, the Court will not challenge the professional investigatory assessment made by Bureau officers who determine that a particular person's appearance will render him more effective in any undercover assignment than another officer. The Court is of the opinion, upon review of the evidence in support of this discriminatory charge and the entire record, that no finding will be made by the Court that individuals suffered discrimination under Title VII on the basis of their appearance.

Two agents testified that the Bureau discriminated against them by bringing the weight of the administrative sanctions upon them for their overweight conditions. The agents believed that the adverse actions by the Bureau was a pretext for discriminatory bias. The Court's findings regarding administrative sanctions notwithstanding, the Court finds that the Record before this Court with regard to these claims is not sufficient to demonstrate pretext.[38]

### Administrative Discipline

The Plaintiffs allege that the Bureau administrative discipline system is applied in a disproportionate manner against Hispanic agents. Most examples cited by the Plaintiffs under the heading of "abuse of administrative discipline system" relate to allegations of retaliation against named Plaintiff Perez and class members for protected activity. The Court will consider allegations of retaliation separately.

 The statistical summaries do not present meaningful distinctions on the application of administrative discipline. The anecdotal testimony at trial covered briefly many discrete events where the perception of the subject of Administrative disciple was that the penalty was harsh and that Anglos are treated less harshly. The record is insufficient to support a finding that Hispanic Special Agents received more actions of a disciplinary nature than did non-Hispanics and that Hispanics were subjected to more "unfounded allegations" or discrepancies as to the severity of the disciplinary actions taken against agents.

### Subjective Evaluation Mechanisms

The FBI employs a subjective evaluation promotional system for all levels within the Bureau and it does not have a review mechanism to ensure compliance with EEO guidelines or the requirements of Title VII. The Executive Career Board has these responsibilities: to review and assess qualifications of managerial candidates; to recommend to the Director persons to fill Career Board vacancies, to screen candidates for assignment to MAP I, MAP II and the Inspection Staff, and to monitor the career

---

**38.** It should be noted that one witness called by the Defendant, not a member of Plaintiff's class, appeared to fit the dimensions of that class member who had been disciplined for his weight. When the Government witness was asked whether he had ever been similarly disciplined, he responded in the negative but averred, "[i]ts not my weight that's a problem, but my height!"

paths of Special Agents in Grades 14 and above. The EEO officer within the Bureau is not a member of the Committee. No recommendations are sent to the EEO officer to ensure compliance with EEO guidelines. Notes from the meetings are incomplete and do not give evidence of the considerations involved in selections. No systems are in place by which patterns of minority promotion can be examined to detect the presence of prohibited considerations. Excessive weight is given to subjective evaluations of persons not present and who occupy lower level supervisory positions. The recommendations of the Career Board are not binding on some lower level management persons and are often disregarded. Not all job vacancies are advertised to all candidates who may be qualified.[39] To the extent that "objective" criteria are within the purview of the Career Board members, the numerical compilation of successful investigative work undervalues the contribution of Hispanics to the success of those investigations.[40]

Both the EEO Officer and Members of the Career Board appearing at trial stated their belief that the Career Board should make certain there is equitable treatment. However, the Bureau has not worked toward this goal by the development of effective mechanisms and techniques to aid the fairness of the subjective evaluation process.

One nominal exception to the finding that there are no mechanisms in place to ensure fairness is the principle that where a leadership deficiency is identified in an agent during a MAP program, the supervisors are "required" to assist the Special Agent in correcting those deficiencies. It sounds good in theory; however, the career board has no mechanism in place to follow-up consistently.

Some past or present members of the Career Board offered the results of the MAP assessment as "objective" indices available to the career board by which to evaluate candidates. In fact MAP is a valuative tool with large subjective bias opportunities. Qualitative evaluations are transferred to numerical index and given the appearance of objectivity. In addition, Defendant did not present at trial any summary listing the minority make up of MAP assessors. Nor is there a statistical summary of the number of Hispanic Special Agents assigned to MAP over a statistically significant period of time.

Finally, evidence demonstrated that some performance ratings made by supervisors are "negotiated." Though top level Bureau personnel testified that they do not condone the practice of negotiating performance evaluations, they admitted to knowing that it exists. The Court has little confidence in the "objectivity" of these evaluations.

The Court does not find that individual members of the career board are "bigots" but only that the promotional system creates a serious danger of allowing impermissible considerations of national origin and pervasively "anemic" evaluation mechanisms to pass over Hispanics on a regular basis for positions for which they are qualified.

### No Complaints; Insufficient Knowledge

The Defendants argued that cross-examination of Plaintiff class members demonstrated that few of the class members had brought EEO complaints to the Bureau Equal Employment Opportunity Officer. The Court does not infer that the reluctance of class members to file their grievances demonstrates uncertainty on the part of Hispanic Special Agents that their complaints are well founded or in violation of applicable laws designed to protect persons from discrimination. Plaintiff class members testified that they did not trust the fairness of EEO procedures in the FBI because they did not ever result in substantiating the employee's allegation.

**39.** It is undisputed that ASAC position openings are not advertised. Defendant maintains that all positions available below ASAC are advertised. The Court does not accept Defendant's

assertion based on the un-rebutted anecdotal evidence introduced at trial.

**40.** Discussed supra at pages 906–07, 909–10.

Further, there is widespread fear of retaliation, or at the least, a negative stigma attaching to an employee who files a grievance. The Court finds that these perceptions of the fairness of the EEO were widely held by members of the class and made in good faith. Accordingly, the failure of class members to file individual grievances in the EEO processes does not weaken the class member's case or work any sort of waiver or estoppel on their charges brought to this Court.

Defendant demonstrated during cross-examination of class members who brought individual claims of discrimination in adverse promotion decisions that class members did not have specific knowledge of the complete qualifications of those agents who received the sought after appointments. The nature of the Bureau requires a great degree of compartmentalization of relevant information. Perhaps as a matter of convenience, all information not strictly necessary to the immediate task is presumptively confidential. As a result, not only bona fide sensitive information is protected, but information that probably should not be widely disseminated to the public is routinely kept from fellow agents. Thus, the qualifications of a peer who is awarded a position ahead of another applicant are not disclosed to anyone because they should not be disclosed to the public. Thus, this Court does find it significant that class members could not document or fully know the qualifications of those who received promotions.[41]

### The Bureau EEO System

As intimated earlier, the EEO process within the FBI is deficient. The EEO officer at the FBI stated that his three principle responsibilities are (1) to ensure that FBI actions are free of discrimination; (2) to develop comprehensive procedure for receipt of processing EEO complaints from FBI employees; and (3) to develop and implement an effective plan of equal employment.

The Court finds that the EEO process does not accomplish the goals of Congress in establishing the EEO program and is in serious need of revision.

At the Bureau, every FBI office has two EEO counselors whose names are posted on bulletin boards in the various field offices. Testimony demonstrated that each "counselor" is given two hours of training by the head of the FBI EEO and a packet of study materials. No effort is made to determine whether the study materials are read or are comprehended.

The Supervisor's EEO Handbook, 1981 Revised Edition, currently in use states, *inter alia*, these guidelines for compliance with the EEO Act:

"Don't base your promotional selections on vague, subjective evaluations of the candidates."

"Do base your promotional selections on objective, job-related factors.

"Do record in writing why an employee was passed over for promotion—and let the employee know, too."

Not one of these three guidelines are respected in any meaningful manner. The Defendants offered testimony in support of the EEO process, to rebut the claim of an ineffective EEO system, and to demonstrate the fairness of promotional systems within the FBI.

No studies have been performed by the EEO or the Bureau to determine whether promotional processes are fair in method or in outcome, or whether assignments, benefits, or training programs are operated in an unbiased fashion. Apart from the two-hour training of EEO counselors and the diffusion of EEO information, the only other significant program organized by the EEO is a once-a-year EEO "retreat" or seminar lasting 3–5 days with inconsistent participation from one year to the next. Testimony demonstrated that the purpose of the seminar is to "look at the relative status of minority employees at the Bu-

---

**41.** The Court found that even where other agents are statistically "better qualified" for a job, some of these disparities in qualifications are due to unrecognized contributions of Hispanic agents to the mission of the Bureau.

reau, and talk about barriers [to promotion]."

The evidence demonstrated that EEO grievances are not "confidential" at any stage of the process. In fact, filing a grievance naming a superior as a "discriminating officer" will result in that superior soon learning about the grievance and no system in place to prevent retaliation. The Defendant did not produce evidence that any Hispanic EEO complaint had ever been found to be substantiated.

At all levels of the FBI EEO grievance process, nowhere does an advocate for the employee have access to all documents relating to the underlying dispute. The evidence demonstrated that where a local office EEO counselor determined that a complaint had some merit and made his views known, the counselor was relieved from the grievance or excluded from the travel and documents necessary to further the investigation. EEO counselors are first selected by the SAC in the field office. Thus, the very person who is responsible for the promotion and evaluation of the EEO counselor is often named as the "discriminating officer" by the grievance. Together, these show, at the least, an insensitivity on the part of the Bureau and the EEO Officer to the appearance of unfairness and collusion between the EEO and the Bureau management.

### *Appointment to Foreign Legat* [42]

In addition to the field offices, the Bureau assigns Special Agents to positions at United States embassies abroad. In the process of performing Bureau investigative functions these Special Agents work with local and national law enforcement entities in the host country. It is a position where competency in the local language is essential to the mission of the Bureau. Plaintiffs' contentions are twofold with regard to the assignment of Hispanic Special Agents to Legat positions:

1. Hispanics are under-represented in selection for those offices where their skills would make them particularly effective for the Bureau, and

2. Hispanics are not at all considered for placement in foreign Legat positions where the local language is a language other than Spanish.

Defendant did not refute the testimony of Plaintiff's class members who stated that no Hispanic has been selected for a position in a non-Spanish speaking nation at all. Nor did Defendant's refute the testimony of Plaintiffs that only one South American post is routinely staffed by Hispanics: Bogota, Columbia. There the conditions are so hazardous that Special Agents assigned to Bogota are not permitted to bring their families. Plaintiff's unrebutted testimony was that Hispanic Special Agents receive far fewer placements than their Anglo counterparts, even though they are, as a group, uniquely qualified. The statistical showing supported the testimony of agents that Hispanic Special Agents are under-represented in assignments to foreign Legat positions.[43]

However, it must be borne in mind that appointment to a significant number of foreign Legat positions, those in Latin Countries, is a position for which Hispanic Special Agents who are fluent in Spanish are particularly well suited. Even granting the presumption that there are no differences among Hispanics and non-Hispanics in *desire* to be appointed to a foreign Legat, the cost of training a non-linguist to a level of fluency seriously undercuts the Bureau argument that business necessity could account for differences in appointment rates favoring non-Hispanics over Hispanic appli-

---

**42.** [Sic]. The Court reserves a running objection to this use of the term by the parties.

**43.** The Plaintiffs' statistical summary, using the date of August 26, 1987, found that 33 Hispanic agents had served a tour in a Legat for any period of time; or 8.7 percent of all Hispanic agents in the sample. In contrast, 1,289 Non–Hispanics, or 15.3 percent of the total had served in a foreign Legat. The statistical summary does not reflect differences in length of tour, position of responsibility in the Legat, or the "desirability" or quality of the assignment.

The Defendant's statistical summary finds Hispanic Special Agents somewhat, but not significantly under-represented. These reports are discussed in more detail infra at pages 919–22.

cants. The "expected" number of Hispanic Special Agent appointments to Latin Country embassies would be greater than the statistically generated random distribution.

In fact, the Bureau did not offer the defense of business necessity to account for the differential. The record reflects that the Defendant challenged anecdotal testimony on the subject with the inquiry as to whether agents who did not receive the appointment knew of the qualifications of the person who was selected. The Office of Liaison and International Affairs ("OLIA") within the Bureau administers the Legat program. The recommendation of the field office SAC is one way to bring Special Agents to the attention of the Office of Liaison and International Affairs; some agents become candidates through other informal means. After an initial "screening process", the OLIA presents candidates to the Career Board.[44]

■ The Court is of the opinion that the Plaintiff has demonstrated a prima facie case of disparate treatment in the assignment of Hispanic special Agents to foreign Legat positions. Defendant has not articulated a legitimate business reason for the differences.

### Accelerated Promotion System

■ The accelerated promotion system putting lawyers and accountants in manager positions at higher compensation while not similarly recognizing the "vital" contribution of bilingual Special Agents violates Title VII and cannot be refuted by resort to "business necessity." The Court noted earlier that some agents whose skills are especially useful to the Bureau for use at headquarters are promoted at a more rapid pace. Bureau officials offered various reasons to justify the practice; in sum, that the needs of the Bureau require an incentive scheme in terms of accelerated compensation and promotion. Thus, the normal "lockstep" pattern of regular advancement from GS 10 (entry level) through GS 13 is departed from for Special Agents with demonstrated ability and experience in law, natural science, or accounting. Then these persons who are known to be "on the fast track" enter supervisory ranks and advance through supervisory ranks at a faster rate.

■ The Defendants admitted the fact of an accelerated promotion system for some agents without admitting the frequency of the practice. The justification is made with resort to the "business necessity" in encouraging these "critical needs" of the Bureau. One high level officer of the Bureau estimated that there are over 1000 lawyer Special Agents in the Bureau to staff perhaps 300 full-time lawyer positions. No similar estimates were offered relating to Special Agents with natural science backgrounds. The Court will assume that there is a "critical need" for these persons to advance the technical/scientific investigative abilities of the Bureau. However, *the Bureau demonstrated at all times in this litigation that the investigative needs of the Bureau make the presence of Spanish speaking Special Agents a "critical" and unmet need at the Bureau.* Thus, business necessity does not justify inconsistent application of the principle that those with a law background should be promoted at a faster rate than those with Spanish speaking ability whether that ability is learned or native. The needs of the Bureau do not justify the disparate monetary valuation of the various skills.[45] The Court has already concluded that the promotional systems in the Bureau are discriminatory; the Court further finds that they are not justified on the basis of "business necessity." The Court has already found that Plaintiffs made their prima facie case of disparate treatment; the Court further finds that Defendant's articulated reason for the adverse employment decisions are a pretext for impermissible considerations.

---

44. See the Court's discussion of the subjective selection process, supra, at pages 914–15.

45. At least one Hispanic law trained agent testified to the anomalous situation of wanting to use his legal ability for the Bureau but was told that his Spanish speaking ability was a greater need for the Bureau.

■ Where the Defendants raise indirectly the justification that employment decisions made with conscious consideration of an agent's Hispanic origins are a Bona Fide Occupational Qualification, the Court finds that where Hispanics are singled out for performance of duties on the basis of their qualifications, they are excluded from promotions and benefits in violation of Title VII and without justification by any element of Bona Fide Occupational Qualification allowances.

### Statistical Analysis

The statistical summaries presented at trial are not relevant to this Court's findings relating to the utilization of Spanish language skills by the Bureau: that is, the disparities between policy and practice; distinctions between duty assignments for Hispanic linguists and non-Hispanic Spanish language specialists; presumption that all Hispanics are bilingual; significant differences in the conditions of employment where burdens fall disproportionately on Hispanic agents; unjustified accelerated promotion program for some skills to the exclusion of Spanish language skill; or the informal practice of requiring exceptional duty by Hispanic agents without reward in terms of benefits or promotion. Nor do the statistical models address the deficiencies this Court found in the Bureau EEO program.

■ Where the summaries are relevant they must be considered in the context of subjective evaluation mechanisms, and poor record keeping of promotional decisions, which make specific promotional decisions virtually unreviewable. Courts should be cautious about any statistical model which over-categorizes a population in some sort of applicant flow, or survival analysis which disregards the effects of systematic discrimination over time. In the case at bar, a pattern of impermissible presumptions have created administrative profiles of agents which are skewed. The Court has rejected assumptions that agents volunteer for all assignments, that the Bureau knows how many persons are fully competent in the Spanish language, or that the entry level classifications of its agents are truly elective and fair. The roster of agents who are currently members of the career development program presumes that no built-in discriminatory factors have reduced the number of Hispanic Special Agents who seek promotional opportunities.

Under these conditions, "applicant-flow" models or "survival analysis" which define a "relevant pool" in restrictive terms is not preferable to more general population studies. The FBI Special Agent population does not present problems similar to those in *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, where one could not presume that the larger population is constituted similarly to the relevant group in terms of qualifications for the positions. The FBI Special Agent pool is, in fact, remarkably fungible for the purpose of staffing management positions.[46] The presumption is that the management group will be made up of agents who possess the whole range of investigative experience in the Bureau.

Nor does a model which micro-analyzes changes over time convince this Court that a bad situation will get better on its own with the passage of time. The problems identified in these pages are intractable owing to their systemic nature. Hispanic agents have been performing at high levels in significant numbers for far longer than the median tenure of a largely non-Hispanic management corps. Infinitesimal gains have been made since the day Perez first brought EEO complaints. The inference that these are token gains is just as likely as Defendant's inference that the Bureau has just recently turned up some qualified Hispanics.

The differences in method and outcome between the Plaintiff's and Defendant's economic models are stark. The Plaintiffs demonstrate significant disparities in nearly all areas between the expected random distribution and the actual distribution; the

---

**46.** See text at page 908 fn. 27 where officials of the Bureau state that all agents are, in principle, qualified for promotion to management levels.

Defendant's expert would have the Court believe that non-Hispanics have been systematically prevented from being promoted and that Hispanics have been favored.

Defendant's analysis, hereafter called the "Klem report," is sophisticated and well written. However, there are significant deficiencies in the underlying assumptions which have grave significance for the explanatory power of statistics. Also, the study focuses on changes over time and completely ignores the absolute differences between the two groups, Hispanic and Non–Hispanic. Whereas the Plaintiffs offer a snapshot of disparities, the Klem report gives us a moving picture of comparisons of smaller and smaller units. The result is that the Klem analysis reduces the chance of finding statistical differences.

No report competently considered the amount of time spent on temporary duty assignments, wiretaps, or undercover work. Klem's analysis makes uncritical assumptions about the voluntariness of Hispanic's choices with respect to offices of preference and whether to remain in the career development program. The Klem report glosses over the issue of whether there is pervasive distrust of the fairness of the career development program. Evidence demonstrated that, after many years in the program, extra duty assignments with no promotions forthcoming, some class-members resigned from the career program in frustration to serve out their career as "brick agents by choice."

Where the Klem report makes comparisons between Hispanics and Non–Hispanics with Spanish Language Ability, the comparisons do not account for erroneous presumptions as to the precise number of competent Spanish speakers which this Court identified above. Supra pp. 904–08.

The Klem comparison of "administratively uncontrollable overtime" concludes that there are no significant differences between the amount of "overtime" put in by Anglos and Hispanics. However, on cross-examination, it became clear that Dr. Klem did not fully understand the TURK, time accounting system, which the Bureau utilizes. The gaps in understanding were significant; for example, two agents who are involved in an undercover operation would account for their time to undercover even though one of the two agents did no more than monitor the operation from the relative security of the office.

The Klem report, which ostensibly demonstrates differences between the two groups for time spent on temporary duty assignments which take them out of the office, does not account for those Spanish language duty assignments which are routinely given to Hispanics at their home field office.

Klem's summaries which are derived from the "TURK" time accounting system proceed from an incorrect understanding. If two agents are involved in an undercover operation, the administrative agent in the office and the other in the streets, both agents would account for the time as "undercover" work. Klem's summaries are not probative of the true time spent by officers in the activity.

The Plaintiff's study,[47] hereafter, the "La Free" report, takes a more modest,[48] and more helpful approach. The La Free "snapshot" approach looks at differences among Hispanic and Non–Hispanic populations within the Bureau on the date of August 26, 1987 and applies a "chi square" test. The results suggest significant differences between the expected frequency (in a system of random distribution) of Hispanics in the manager ranks and the actual number.[49] When the expected and

47. Prepared by Dr. Gary D. La Free, Ph.D Indiana University of Indiana, 1979.

48. Much of the information given to the Plaintiff expert during the course of discovery came in piecemeal fashion over many months. Original documents and demographic summaries were "redacted" and otherwise incomplete. Both parties were under serious time con-

straints. Plaintiff's expert was not given assistance encoding information due to security constraints. However, inexplicably, Defendant's data bases seemed to have been available to their expert at a much earlier date and in a more complete manner.

49. La Free report, table 1, page 7.

actual numbers of Hispanics is broken down for each FBI job grade, the low representation of Hispanics in grades 15 through 18, the top level managers, is particularly striking.[50]

Though the accelerated promotion pattern enables some agents with less than five years in the Bureau to achieve the grade of GS14, a period of five years represents, in general, the minimum number of years within the FBI for management consideration. When the La Free report compared Hispanics and Non–Hispanics with five or more years of job experience in the Bureau, the differences between these two groups reveals statistically significant differentials.[51]

Significantly, in those supervisory positions with most influence in the subjective evaluation process for promotions, SAC's, Inspectors, MAP Assessors, and Career Boards, the absolute number of Hispanic Special Agents is almost nil. Though the statistical universe is too small to study adequately, the Defendant did not refute the strong evidence contained in the statistical reports, exhibits, and anecdotal reports. At the time of trial it was clear that: no Hispanic agent sat on any Career Board; only two of the 289 Inspectors are Hispanic; there have never been any MAP II Hispanic Assessors and few MAP I Hispanic Assessors; and only one Hispanic SAC.[52]

Defendants assert that differences between the actual number of managers and the expected number can be explained because a condition precedent to entering manager ranks is to become a relief supervisor. In other words, the entry level career development position, is "volitional." The argument is that there are fewer Hispanic relief supervisors; thus, the fact that there are fewer Hispanics among manager ranks should not be surprising. However, the great weight of the anecdotal testimony rejects the hypothesis that Hispanics are less present in the career development program because they choose to forego promotion. Years spent as a relief supervisor for some Hispanic agents were years of increased administrative work load with no real chance for promotion. The Court does not find that the number of Hispanics in the relief supervisor ranks truly reflects the number of Hispanics who seek promotion within the Bureau. The Court specifically finds that the use of an applicant-flow statistical model which uses the number of relief supervisors as the relevant applicant pool is inappropriate in this case.

The La Free report uses the benchmark of 4.3% representation of Hispanics among the ranks of Special Agents. The Klem study actually ignores this benchmark as it compares small groups of agents using applicant-flow and multi-regression analysis. Though sophisticated, the Klem report misses the forest for the trees. The Court is of the opinion that the broader comparisons are probative of significant differences which are the result of specific employment practices and not reasonably "random" outcomes.

### Retaliation and the Named Plaintiff's Individual Claims

■ Section 704(a) prohibits retaliation against employees for having "opposed any practice made an unlawful employment practice by this title" or for having "made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. Sec. 2000e–3(a). The protection afforded employees is broad; the persons opposing an apparently discriminatory employment practice do not bear the entire risk that it was lawful. A reasonable belief that the practice is prohibited by Title VII is sufficient to invoke the protection against retali-

---

**50.** La Free Report, table 2 p. 9. Probability of getting the actual distribution is .0011 or one chance in a thousand of getting this distribution. Utilizing a one-tailed test where the actual number on August 26, 1987 is 6 and the expected number is 19.

**51.** La Free report, table 3, p. 13. Probability less than .01 or one in a 100 of achieving this distribution by random chance.

**52.** This SAC was recently appointed and *not* a member of Plaintiffs' class action.

ation. See e.g. *Berg v. LaCrosse Cooler Co.*, 612 F.2d 1041 (7th Cir.1980).

■ The proof of a claim of retaliation is similar to the "burden shifting pattern" associated with proof of disparate treatment. See *Whatley v. Metropolitan Atlanta Rapid Transit Authority*, 632 F.2d 1325 (5th Cir. Unit B 1980); *Smalley v. City of Eatonville*, 640 F.2d 765, 769 (5th Cir. Unit B March 1981); and *DeAnda v. St. Joseph Hospital*, 671 F.2d 850, 856 (5th Cir.1982). However, the burden itself is high; the employee must demonstrate that his participation in the protected EEO activity and the adverse employment decision is related. The plaintiff must show that but for his participation in the grievance process the adverse action would not have occurred. *Jack v. Texaco Research Center*, 743 F.2d 1129, 1131 (5th Cir.1984) (Employee prevailed at District Court level when Court found that the EEO activity was one of the reasons for the discharge. Fifth Circuit vacated and remanded requiring a showing that but for the protected activity, she would not have been discharged. *Jack*, 743 F.2d at 1131.)

■ Though the law does not require an employee to determine correctly whether or how Title VII applies to subjective promotion practices, the Defendants and their employers are deemed to know that Title VII prohibits retaliation against an employee who brings a Title VII complaint.

The Plaintiff's claims of retaliation can be grouped into the following categories: (1) Plaintiff Bernardo Perez's individual claims relating to retaliation against himself and persons associated with him for his bringing discrimination complaint is under the FBI EEO administrative process; (2) The allegations of class-members (including named Plaintiff B. Perez) that the Bureau has retaliated against them for their activities relating to this litigation.

Allegations that the Bureau has retaliated against Perez can in themselves constitute evidence of disparate treatment if the manner chosen to penalize a claimant is employment related, punitive, and it can be shown that a person not within the protected group received more favorable treatment for similar conduct. Thus, the anomalous situation can arise where an employer, not originally guilty of discrimination, could retaliate against an employee for protected EEO activity and in so doing, make out a case for employment discrimination. Where, as in the case at bar, the EEO process is itself so closely tied to the policies and practices of the employer such that the administration of the EEO process is indistinguishable from the administration of the Bureau, it is difficult to characterize adverse employment decisions as clearly retaliatory or clearly discriminatory. Thus, findings of this Court relating to named Plaintiff Matt Perez personally apply to the over-arching allegations of discrimination in certain relevant parts.

Bernardo "Matt" Perez is not a "native" speaker of Spanish. He attended Georgetown University where he learned Spanish. Shortly after graduating, he served in the clerical ranks of the Bureau from 1960 for several years and then became a Special Agent. During his long career at the Bureau he served in Tampa, Miami, Los Angeles (2 times), San Juan, and El Paso. He performed two special "tours" of long duration in diplomatic attaches and satellite offices for the Bureau in South America. There is no serious dispute that Perez was highly successful during his career as an investigative agent.[53] He was one of the earliest and most successful pioneers of undercover techniques, playing a variety of roles as he rose through the ranks at the Bureau. As a Special Agent, not an "Hispanic" Special Agent, Perez's record demonstrates the kind of character and courage which helped rank the Bureau among

---

53. During the course of Discovery, Perez's personnel files were released in redacted form encompassing over 25,000 pages detailing Perez's professional history as well as administrative inquiries related to the EEO activities which are the subject of this litigation. Perez may be the most carefully scrutinized Special Agent in the history of the Bureau. It is significant that even though there have been serious accusations made against Perez by members of the Bureau and targets of investigations acting out of a variety of motives, no meaningful breach of professional duty or law has even been demonstrated.

the highest quality professional law enforcement agencies in the World.

Perez's own history on Spanish language assignments differs from those of class members only in number of years, not in kind. Perez assisted in an informal manner in translating activities throughout his career and performed more than his share of wiretap and special duty assignments. Perez spoke warmly of the persons who served as his mentor during his career, teaching him, supporting him, and assisting in the promotional process by bringing his successes to the attention of those persons in the Bureau who made the promotion decisions. Though Perez eventually became the highest ranking Hispanic FBI agent in the Bureau, he testified that promotions came at a time when peers and juniors had already occupied higher rungs on the ladder.

Through the testimony of named class member Matt Perez, other members of the Plaintiff class and persons outside the class, the picture emerged of Special Agent Perez possessing a fairly "non-institutional" approach to the mission of the Bureau. He focused on substance over form; that is, a successful operation was more important than the administrative play book. Perez's unorthodox investigative techniques (and his successful record) and a demonstrated ability to develop smooth professional relationships with local police organizations were well known within the Bureau at the time of his significant promotions to ASAC and SAC in San Juan in 1979 and 1980.

All persons connected with the Bureau agree that San Juan is one of the most difficult assignments for any agent in the Bureau.[54] Drug interdiction and anti-terrorist activities are central to the mission of the Bureau in San Juan. The Spanish language ability is virtually essential to widespread investigative success for Special Agents. Animosity toward Hispanic Bureau agents is especially high among criminal elements in San Juan. Every agent, Hispanic or Anglo, testifying at trial demonstrated directly or indirectly that San Juan is a "hardship assignment" for agents.[55]

Perez's assignment to San Juan, as the first Hispanic Special Agent in Charge, presented challenges for leadership within the office and between the Bureau field office and the San Juan community. Agents who served under Perez during his tenure as SAC testified that Perez was making inroads against serious corruption within local government institutions and crime elements. There were at least four major operations conducted out of the San Juan office during Perez's tenure, placing extraordinary strains on the resources of the Bureau and Perez's management abilities. Perez testified without rebuttal by the Defendant that, when he became SAC in San Juan, three-fourths of the agents assigned to the office could not speak Spanish well enough to conduct investigations. One-fourth of the agents, Spanish speakers, performed the lead roles in all field investigations. Non–Hispanic agents were not required to develop a proficiency in the Spanish language. Perez noted that, though some non-Hispanic agents attended office language courses, after many months, many could do no more than exchange awkward greetings. The Bureau

---

**54.** One can infer that San Juan is a dangerous environment for agents in that the Bureau pays for car alarms and security devices for the homes of Special Agents. Minor children of agents assigned to San Juan are transported to a U.S. Navy installation school where possible. Disease rates among the population were significantly higher in San Juan as compared to large urban cities in the United States owing to occasionally unsanitary community water and waste water conditions.

**55.** Persons testifying for the Bureau made the specious claim that some Hispanic agents had stated a preference to be transferred to San Juan as evidence that the assignment is not a hardship for agents. However, Plaintiff class-members successfully rebutted this assertion by stating that the widespread perception among Special Agents is that Hispanic agents—Spanish speaking and not—are virtually certain to be assigned one or more times in their career to San Juan for long periods. Thus, some Hispanic agents register San Juan as their office of preference so that the assignment to San Juan can be accomplished early in their career before it would work too much of a hardship on themselves or on adolescent children.

had no testing procedure or administrative sanctioning process to facilitate the development of this "critical skill" among non-Hispanic agents. Thus, Perez noted, Anglos were the "coordinators" rather than investigators. Even during Perez's tenure, owing to the evaluation and accounting procedures within the Bureau, non-Hispanic agents in San Juan "held the ticket" for investigations performed most often by Hispanic field agents.

Perez made efforts to secure the resources, both materials and manpower, he needed to accomplish the tasks set for him. There is dispute among the parties as to the amount of support Perez received and Perez's ability to manage the resources he was given. Weighing the evidence, the Court is of the opinion that on balance, Perez was highly successful in his position as SAC in San Juan and the record does not support the negative evaluations made by the inspection process. The Court does not differ with any individual finding of the inspection staff relating to generally trivial matters in comparison with the Bureau activities in San Juan. However, the overall evaluation which found that Perez was an incompetent manager was not justified under the circumstances. The inspection systematically and conspicuously ignored details crucial to competent evaluation of the environment facing the San Juan SAC and the resources given him.[56] Perez was relieved of his duties in San Juan and transferred to Los Angeles in 1982 based on the findings of the 1981 inspection.

 The person who succeeded Perez in San Juan was given a "blank check" to make dramatic increases in the number and experience level of agents assigned to San Juan and to have at his disposal all of the resources available in the FBI to assist him. Perez was not given similar support. The person relieving Perez was not an Hispanic. The Court finds that the poor inspection report, transfer, and career decisions made by the Bureau were a pretext for prohibited considerations of Bernardo "Matt" Perez based on his national origin.

In Los Angeles, Perez was designated ASAC in charge of Administration. From the first, the acting SAC let Perez know that the SAC was conscious of Perez's national origin, and his administrative "failure" in San Juan. There was an open antipathy toward Perez's presence which became over time open hostility between the ASAC and the SAC. It was during this period in Los Angeles that Perez brought complaints under the EEO program at the Bureau.[57] The complaints specifically named the SAC at Los Angeles as the discriminating officer.[58] The Court finds that the named discriminating officer, in a position of responsibility over Perez's duties, made employment decisions with significant adverse impact on Bernardo Perez by systematically excluding Perez from the flow of information necessary for Perez to perform his administrative responsibilities. If Perez did not perform up to the SAC's expectations, the SAC himself was the cause of engineering the deficiencies by not adhering to developed office administration systems and not making efforts, efforts he was demonstrably capable of making with Anglo subordinates, to integrate Perez into the decision-making process. Long developed and normally excellent systems for professional interaction among top staff broke down. Perez, the senior ASAC, was excluded from key administrative meetings, undercut in authority, and given low evaluations for legitimate

---

**56.** The inspection report itself, by omission and commission, demonstrates an evaluation made of Perez that is at odds with the evidence of Perez's performance. By testimony of other class members not adequately rebutted by the Defendant, it is likely that the inspection of San Juan began with a predisposition to find inadequacies in Perez' work.

**57.** EEO Complaint Nos. F83–4010–0 and F84–4006–0. The Bureau EEO office found them without merit. The Department of Justice con-

solidated these complaints and declared them without merit on December 19, 1986.

**58.** Perez has alleged discrimination based on national origin and religion; the Court, at ps. 85–86 infra, finds the charge of religious discrimination misplaced. The attitudes and actions which Perez implicates, under the law and in logic, do not show religious discrimination but, rather, national origin discrimination.

investigative and administrative successes Perez accomplished.

■ In response to the strong evidence of discriminatory and retaliatory animus, the Defendant put on evidence that tended to show Perez performed poorly on several specific tasks. The Court is of the opinion that the tasks were ill-defined and, taken together, not of the character as to justify the adverse employment decisions made against Perez affecting the conditions of his employment and his career. The self-serving statement of the then acting SAC that he has no discriminatory animus against Perez do not overcome the great weight of the evidence. The Court finds that Perez was not without good faith justification in bringing his EEO complaint against perceived discriminatory acts made against him. The Court finds that the articulated reasons given to justify the adverse employment decisions were a pretext for retaliation against Perez for protected EEO activity. The Court finds that but for the filing of the EEO Complaints naming the SAC as a discriminating official, the adverse employment decisions would not have been made.

Other administrative superiors in Washington, testifying in response to Plaintiff Perez's prima facie showing of retaliation, demonstrated that they participated in the SAC's decision to make decisions with adverse impact on Perez. The Court finds that rather than absolving either the SAC in Los Angeles or Bureau superiors in Washington, the testimony demonstrated a collusive pattern of employment decisions made with adverse impact on Perez cause by protected EEO activity by Perez.[59]

Perez was transferred to El Paso in 1985. It appears that at about this time Perez's focus of concern for employment conditions within the Bureau shifted from those employment decisions affecting him personally to those conditions which affected other Hispanics at the Bureau.

Perez alleges that three other persons were retaliated against by the Bureau for assisting him in his bringing the EEO complaints. Though there is strong evidence to support this proposition with regard to each of the three, on the basis of the record at this point, the evidence in insufficient to demonstrate the requirement of a "but for" causal connection between the activity in support of the EEO complaint and the adverse employment decisions. *Jack v. Texaco Research Center,* 743 F.2d 1129, 1131.[60] Perez also states that certain administrative investigations made by the Bureau against him were directly related to his engaging in protected activity; the reasons given were a pretext for retaliation. The Court is of the opinion that one administrative inquiry which named both insubordination and perjury, and which caused a Bureau official to seek and utilize a grand jury subpoena in investigating allegations which could not, as a matter of law, result in criminal indictment for perjury, requires the hearing of further testimony by the Court. By supplemental findings, the Court will revisit this issue.[61]

### Retaliation and the Class Claims

The allegations relating to retaliation by members of the Class are less amenable to the application of the test set out by this Circuit in *Jack v. Texaco Research Center.* The required proof to make out a prima facie case of discrimination against Hispanics based on employment conditions and promotional processes was a great burden to prosecute and to defend. To demonstrate that each retaliation occurred and that it was sufficiently related to this litigation so as to meet the but-for causation requirement would be beyond the endur-

---

59. "She doth protest too much, methinks." The Queen in *Hamlet,* Act 3, Scene 2, Line 242.

60. Two of the three employees remain at the Bureau. The Court is confident that no further decision will be made with respect to conditions of employment or promotion within the Bureau for prohibited reasons.

61. By separate Order entered this day, the Court will set a hearing date for the Defendant to present testimony relating to the above-referenced incident. The testimony heretofore implicates both disparate treatment in unequal application of the administrative discipline process, and retaliation directed against Plaintiff Perez for protected activity.

ance of counsel, the patience of this old Judge, and would not significantly serve the ends of Justice. The Bureau is staffed, top to bottom, by professionals with great respect for the laws of this land. Corrections will be made in employment practices. It is time for the agents, their families, and the Bureau to get on with their work. Insofar as the exacting requirements of the law to demonstrate retaliation, the record is insufficient to make such a finding. Insofar as the parties understand the requirements of the law and the findings of this Court relating to the policies and the practices of the Bureau, the Court is confident that retaliation will not occur.[62]

*Religious Discrimination*

Title VII prohibits discrimination on the basis of religion.[63] The Plaintiffs allege that Hispanics have been systematically discriminated by Mormon agents within the Bureau and that the discrimination is the result of biases related to both their national origin and religious affiliation.

Evidence introduced at trial on this subject was entirely anecdotal. The statistical study did not encompass disparities in this area.

▄▄▄ The Court finds that Plaintiff did not demonstrate by the preponderance of the evidence that any discrimination by members of a religious group against members of another was based on religious grounds. The evidence that Mormons received favorable treatment and Hispanics less favorable treatment is evidence of disparate treatment based on national origin and not the religious affiliation of a discrete group of Anglo agents or the religious affiliation of Hispanic agents.[64] The evidence that Mormons favored fellow Mormons over Hispanics equally or better qualified for the positions is significant only insofar as Mormons, in a position to make subjective judgments about the qualifications of Anglos against those of Hispanic persons available for the positions, chose in disproportionate numbers an Anglo for the position whether he be Mormon or not.

Some of the testimony at trial was probative of the proposition that Mormon supervisors made personnel decisions which favored members of their church at the expense of Hispanic class members. The Court declines to make any finding in this regard. Nor does the Court find that Plaintiffs made a prima facie case of disparate treatment against the Defendants because of a predominant religious affiliation of class members. Nor does this Court find that discriminatory acts by the Defendant can be ascribed to the religious affiliation of members of the Federal Bureau of Investigation.

*Equitable Remedies*

▄▄▄ The Court must next address the development of appropriate equitable remedies. Compensatory and punitive damages are not available to the Plaintiff class under Title VII. Section 706(g) authorized the award only of equitable relief, in the form of back pay, front pay, remedial seniority, injunctions, and declaratory relief. This Court has addressed for other purposes the balancing of public and private interests which control the grant of declaratory or injunctive relief. Cf. *Weinberger v. Romero Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); *Hecht Co. v. Bowles,* 321 U.S. 321, 329–330, 64 S.Ct. 587, 592 88 L.Ed. 754 (1944).

▄▄▄ This Court is mindful that portions of the FBI mission, those relating to foreign counterintelligence and staffing of foreign diplomatic posts, encompass activities central to the "delicate, plenary and exclusive power of the President as sole

---

**62.** At the first sign that agents who testified at trial were subjected to close scrutiny or challenge upon their return to their posts, the Bureau immediately made clear to all offices that retaliation in any form would not be tolerated.

**63.** Three other provisions of Title VII apply to religious discrimination but are not relevant here: Sec. 702 (exception for employment by religious organizations and schools); Sec. 703(e)(2) (exception for religious schools); and Sec. 701(j) (definition of "religious practices.").

**64.** There is evidence that at least one Hispanic Special Agent was also a member of the Mormon Church.

organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress." *United States v. Curtiss-Wright Export Co.*, 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936). Doubtless, the authority of the Director of the FBI to name the persons who serve in foreign posts flows from the Constitutional power of the President in the area of foreign relations. Though the basis for exercising this power does not require an act of Congress, the manner in which the power is exercised can be the subject of judicial review applying Federal Law. Thus, the manner, practice, and procedure by which persons are selected for those positions can reasonably be the subject of this Court's scrutiny. This Court, finding that a violation of Title VII exists, will seek the assistance of the parties to fashion an appropriate remedy which does not unduly invade the province of the Executive as it seeks to interdict systemic discrimination in the promotional process.

▮ A starting point for this Court's fashioning of a remedy is that the finding of a violation of Title VII justifies issuance of an injunction against the discriminatory practice. See *International Bd. of Teamsters v. United States*, 431 U.S. 324, 361, 97 S.Ct. 1843, 1867–68, 52 L.Ed.2d 396 (1977). The parties are directed to examine whether changed circumstances with regard to certain practices which have a discriminatory impact render an injunction inappropriate. See *Albermarle Paper Co., v. Moody*, 422 U.S. 405, 436, 95 S.Ct. 2362, 2380–81, 45 L.Ed.2d 280 (1975).

Whether back pay would be appropriate is not an easy question. The Supreme Court stated in *Albermarle Paper Co., v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), that an award of back pay to victims of discrimination "should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." Id. at 421, 95 S.Ct. at 2373.

In some cases, "competitive seniority" or "rightful place" seniority may be appropriate after a vacancy in the relevant job. *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 770–71, 96 S.Ct. 1251, 1267, 47 L.Ed.2d 444 (1976). However, the Court has no intention of bumping incumbent employees out of their jobs to create a vacancy.

▮ In the recovery stage of the trial, employers bear the primary burden of demonstrating that a class member is not entitled to relief. The class member must demonstrate that he or she applied for the job in question in order to shift to the Bureau the burden of proving that the member was not a victim of discrimination because of lack of qualifications or the absence of a vacancy at the time of application. The task is complicated because the class member must also demonstrate that he or she is qualified at the time the relevant position becomes vacated and promotion is offered. See *Franks*, 424 U.S. at 772–73, nn. 31–32, 96 S.Ct. at 1268, nn. 31–32.

The costs to the Treasury and the persons involved of waging this litigation have already been enormous. The Court is inclined to find that injunctive relief in the form of significant improvements to a bankrupt EEO process, significant improvements in the promotional systems, and the institution of a compensation system more closely related to the contribution of the class members to the mission of the FBI, together with a recovery for the costs of bringing this suit are sufficient redress to the Plaintiff. However, the Court will reserve its ruling on the precise remedy until it has heard from the parties.

### Attorney Fees

Section 706(k) authorizes an award of attorney's fees to the prevailing party in Title VII cases. Civil Rights Act of 1964, Sec. 706(k), 42 U.S.C. Sec. 2000e–5(k). The Supreme Court interprets this section to require the award of attorney's fees "unless special circumstances would render such an award unjust." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 416–17, 98 S.Ct. 694, 698, 54 L.Ed.2d 648 (1978).

The Plaintiff is directed to submit within 30 days of this date affidavits in support of its request for attorney fees. The Plaintiff will be given leave to supplement this request after the recovery portion of the litigation. Defendants should respond within 20 days of receiving Plaintiff's counsel's affidavits. Counsel are directed to frame their arguments regarding the calculation of attorney's fees in the manner set forth by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). Counsel may address in any manner appropriate the entitlement of Plaintiff's counsel to an award of attorney fees.

### Errata

The Government's ability, or the Bureau's ability, to stamp out prejudice is a difficult one. It is not, however, impossible. By force of decree or administrative formulation, systems can be improved but it is unlikely that prejudices will be banished. Most of us are trained from birth to make distinctions between persons which unfairly delimit the true capacity of another person. We ascribe erroneous generalized characteristics of the group to members of those groups and compound the error. It is only by education and understanding that prejudice can be reduced and, hopefully, ultimately done away with in our relations with our fellow human beings.

The intractable nature of the problem of prejudice should surprise no one. For over 2,000 years, those of the Christian faith have been unable to completely adhere to the command given in Mark 12:31. ("...Thou shall love thy neighbor as thyself....")

The Court could not help but sense animosity and ill feeling by and among the Plaintiffs and other members of the Bureau. This greatly saddens the Court. Though it goes without saying one does not like nor appreciate being the victim of discrimination, but it is equally true that no one likes to be brought to trial in Court and called a violator of the law of our land.

The FBI is a paramilitary organization. Orders must be given and obeyed. No agency which is responsible for enforcing the laws of our land and protecting us from foreign enemies can survive in a climate where insubordination is tolerated. It is clear from the evidence heard by the Court that Special Agents, Anglo and Hispanic alike, put their lives on the line every day. They operate in a climate of danger and must know that they can count on their subordinates, their equals, and their commanders. If one disobeys a command, the whole structure falls. However, make no mistake, the corrosive force which threatens to erode the trust and loyalty of the department is invidious discrimination which Title VII prohibits rather than the suggestion by Hispanic Special Agents that the Bureau policies and practices should be scrutinized.

The decision in this case that policies and practices of the FBI violated Title VII with respect to their treatment of Hispanic agents was a most difficult decision for this Court to reach. The FBI deserves the well earned respect of United States citizens. It is as true today as at any time in the history of the Bureau that persons of discipline, character and ability should aspire to its ranks. The Bureau is arguably the best law enforcement agency in the world. Unfortunately, this does not mean that the Bureau is incapable of violating the provisions of Title VII. No one person is perfect, nor is any agency above violating the law of our land.

Corrections are necessary. There must be some fine tuning of the Agency's relationship with its fine Hispanic members, both those within and without the class.

The Court recognized that Defendant Sessions was only recently made a Defendant in this Court. He has been the Director for only 11 months, and most, if not all, of the events heard by the Court which resulted in this Judgment "did not occur on his watch." The Court finds, as a matter of fact, that Director Sessions has not ordered nor directed, nor personally participated, in any disparate treatment of any Hispanic agent currently or formerly a member of the Federal Bureau of Investigation.

It is obvious to the Court that discrimination did not have its origins with the FBI's own beginnings. Rather, discriminatory practices evolved over 20 years or more when the need for Spanish speaking ability became paramount. The influx of controlled substances from South America and Central America together with a shift in law enforcement techniques, created conditions whereby manpower resources were directed in ever-increasing amounts toward drug interdiction and counter intelligence activities involving the Latin community. The implication of the Court's findings this day are that the management of the Bureau's employee resources visited disparate conditions of employment and employment opportunities on Hispanic agents which are not required by the mission of the Bureau.

The comparison was often made to the Court that civil rights and terrorism investigations which required infiltration of the Clan required non-Hispanic agents to perform dangerous undercover work for which the Anglo agents were uniquely suited. Though the comparison is not without value, the differences are striking: there were not systemic and intractable barriers to promotion associated with the agents who performed Clan undercover work; and far greater manpower resources could be drawn on to share the burden in a more equal manner of temporary duty assignments. The Clan comparison was not supported by evidence that *every* Anglo was presumed competent and available to perform undercover assignments just by his appearance (anglophile). The comparison between Clan infiltration and Latin directed investigations breaks down when one examines the entire record of disparate treatment in conditions of employment and promotion opportunities.

In summary, Plaintiffs have not prevailed on their claims relating to religious discrimination by members of the Bureau, Class-wide claims of administrative discipline, discrimination in terms of office assignments and transfers. Plaintiff has demonstrated a pattern and practice of discrimination relating to conditions of employment and promotions. The EEO program in the Bureau is in need of significant improvement. Named Plaintiff Perez has demonstrated that the Bureau has retaliated against him for protected activities related to this litigation and his EEO complaint.

This Court is of the opinion that the record, at this time, does not support a finding of retaliation as to members of the Plaintiff Class for their activities relating to this litigation.

For the foregoing reasons, the Court will reconvene at an early date to consider the second part of the bifurcated trial.

IT IS ORDERED that the parties, through counsel, advise the Court within 15 days of the amount of time required to prepare for the second part of this trial relating to equitable remedies and individual claims.

### ORDER

THIS COURT, by separate Memorandum Opinion entered this day, issued its Findings of Fact and Conclusions of Law on the bifurcated portion of this cause. *Inter alia,* the Court found a pattern and practice of discrimination in conditions of employment and promotional opportunities as to the Plaintiff class. Though the Court did not find sufficient evidence to support a finding of retaliation by the Defendant against members of the class, the Court did find that certain acts against named Plaintiff Perez constituted retaliation for protected activity.

The Court specifically left unresolved the matter of a grand jury subpoena secured in the course of an administrative investigation of Plaintiff Matt Perez, after the date of his bringing an EEO complaint. Plaintiff has demonstrated by competent proof that a grand jury subpoena was secured and its relatedness to the administrative investigation. Defendant, at the trial on the merits, did not respond.

The Court is of the opinion that a response is required. If the subpoena was secured by an officer of the Bureau, then it is strong evidence of retaliation. If the subpoena was wrongfully secured and no criminal or administrative sanction was

brought against the FBI officer, then this is evidence in support of Plaintiff's allegation of disparate treatment.

Unrebutted, the evidence offered at trial is sufficient to support findings by this Court of both retaliation and disparate treatment. Defendant should be given an opportunity to respond. Accordingly,

IT IS ORDERED that this matter be set for hearing at an early date by the Court. Defendant will be given an opportunity to respond to Plaintiff's allegations and Plaintiff will be given an opportunity to cross-examine Defendants' witnesses, if any, and offer further evidence in support of its claims in this regard.

IT IS FURTHER ORDERED that Defendant advise this Court, in writing, within 15 days, whether further hearing on this matter is required. Should the Defendant proceed on this matter, the hearing is set for 9 a.m. on November 28, 1988.

## ON ISSUES RELATING TO GRAND JURY SUBPOENA

This Court, on September 30, 1988, entered its Findings of Fact and Conclusions of Law in the above-numbered cause finding, inter alia, a pattern and practice of discrimination by the FBI as an employer regarding conditions of employment and promotional opportunities which have an adverse impact on Hispanic Special Agents. With regard to named Plaintiff Bernardo Perez, the Court found that he was the victim of retaliation for bringing this action, by the Bureau, acting through its officials [1]. The Court declined at that time to find that the evidence supported a finding of discrimination by the Bureau against other members of the Plaintiff class.

The Court left unresolved in the September 30, 1988 Memorandum Opinion issues relating to the securing of a Grand Jury subpoena by Bureau Officials in the course of an administrative investigation of Perez.[2] The Court set the matter for hearing on November 15, 1988.[3]

The record demonstrates that the FBI undertook to investigate Bernardo Perez on the allegation of a Bureau official that Perez perjured himself in his testimony during a federal criminal prosecution of a special agent for espionage. The results of the investigation were detailed in a September 25, 1987 memorandum prepared by an investigation team to John Glover, Assistant Director of the FBI, recommending that Perez be discharged from the FBI. Assistant Director Glover did not concur in the recommendation contained in the September 25 report. The inquiry of this Court focused on the circumstances surrounding the procuring of the Grand Jury subpoena, the manner of investigating Perez, and the use of the material received by the investigators under the authority of the subpoena.

The Findings of the Court this day are to be deemed Supplemental Findings of Fact and Conclusions of Law as to the liability portion of the bifurcated trial.

### Findings of Fact

1. Richard T. Bretzing, formerly the Special Agent in Charge of the Los Angeles office, and Bernardo M. Perez, Plaintiff in the above-numbered cause, each testified in the two espionage trials of former FBI

---

1. The Court specifically excepted from this and other findings the current Director of the Bureau, William Sessions. See p. 928, September 30, 1988 Memorandum Opinion.

2. "Plaintiff has demonstrated by competent proof that a grand jury subpoena was secured and its relatedness to the administrative investigation. Defendant, at the trial on the merits, did not respond. The Court is of the opinion that a response is required." Separate Order (p. 1) entered September 30, 1988 by this Court in this civil cause.

See also the discussion on page 925 of this Court's opinion on the liability portion of the bifurcated trial.

3. At the November 15 hearing the Court did not hear arguments or evidence on a post-trial allegation by members of the Plaintiff class that they were subjected to retaliation for their membership in the Plaintiff class and activities related to the litigation. The Court's findings this day are limited to an administrative investigation of Matt Perez in 1987 after the date of the filing of the case and prior to the commencement of the trial.

Special Agent Richard W. Miller in 1985 and 1986. Perez testified under a subpoena issued by counsel for the Defendant; Bretzing was called by the prosecution. It was not the first time that the two gave testimony under oath on matters related to the same underlying charges. During late 1984 and early 1985, Perez and Bretzing testified during an Equal Employment Opportunity Commission hearing convened to consider Perez's allegations of National Origin discrimination.

2. At the conclusion of the espionage trials, Bretzing alleged that Perez perjured himself during the trial. It is uncontested that Bretzing was not present during Perez's testimony but received an account of Perez's testimony second hand. The FBI undertook an investigation of the allegations of perjury against Perez. Perez countered with allegations that Bretzing perjured himself during the trials.

3. Accordingly, in 1986, William Gavin, the Assistant Director of the Inspection Division at the FBI, was directed by superiors to recommend a special agent to investigate Perez. Gavin selected Special Agent Gary Hart because Hart had proven himself a "dogged investigator." Gavin testified that at the time he made the selection, he was aware that Perez had filed a complaint with the EEOC. Hart was charged with investigating whether Perez or Bretzing made statements or misstatements during the Miller trials which violated federal criminal perjury statute or violated FBI standards of conduct. Thus, the potential existed for both criminal indictments or administrative sanctions for the two agents.

Hart first undertook a detailed analysis of Perez's testimony during the EEOC hearings and the espionage trials. On January 8, 1988, Inspector Hart wrote to Bernardo Perez, then assigned to the El Paso Field Office, to introduce himself and explain that Hart wanted to give full attention to Perez's allegations of misconduct by Bretzing. On January 22, 1988, Hart contacted Perez by telephone. They agreed that Perez would contact Hart when Perez came to Leesburg Virginia for a seminar the following week. Hart and Perez would meet in Leesburg. In none of the contacts by Hart to Perez did Hart inform Perez that Perez was under investigation for any criminal matter or that Hart had already recommended to the Department of Justice that indictments be sought for perjury against Perez.

4. Perez travelled to Virginia to attend a seminar at the Xerox facility in Leesburg. A snowstorm blanketed the Washington D.C. area and the FBI headquarters was closed. Hart testified that he was at his desk in Washington during January 26 and 27 workdays. Perez testified that on these days he attempted to contact Hart at the FBI but was told by the receptionist that the FBI was closed due to the worsening storm. The seminar ended early and Perez returned to El Paso to avoid being stranded in Washington by the snow.

5. On January 29, 1987 the D.O.J. communicated to Hart that no criminal indictments would be sought on the basis of Hart's investigation of Perez. Thus, as of January 29, 1987, the criminal element of the investigation of Perez which had been assigned to Hart was extinguished.[4] However, Hart continued an administrative investigation of Perez of testimony which did not constitute perjury in the opinion of the Department of Justice but was nonetheless, in Hart's view, inappropriate for special agents of the FBI. It is relevant to this Court's analysis that less then three weeks previous, Perez became the named Plaintiff for a class of special agents complaining that the FBI discriminated against its employees. Perez and his complaints were notorious within the FBI.

6. On February 1, 1987, Agent Gavin, at Hart's insistence, directed Perez by teletype to leave the next day for Washington to meet with Hart "on threat of insubordination."[5] Perez complied and an inter-

---

4. Perez's allegations against Bretzing were considered to be without merit by the FBI investigators and were not referred to the Department of Justice for a prosecutive opinion.

5. These were the terms used in the teletype and confirmed by testimony to this Court as summing up the view of the persons directing Perez to Washington.

view commenced on February 3 in Washington and continued on February 4. From the first, the interrogation focussed on Perez's failure to contact Hart the previous week from Leesburg. Perez stated to Hart that he had tried on two occasions to contact Hart and explained the circumstances of his early departure for El Paso.

7. On February 4, 1987 Hart contacted Special Agent Connolly and directed Connolly to proceed to the Xerox complex in Leesburg and determine whether Perez attempted to contact the FBI on January 26 or 27. Hart and Connolly each testified that they did not specifically designate in their call a violation of 18 U.S.C. Sec. 1001.[6] Connolly testified that he understood that he was implementing an investigation by Hart of Perez to determine whether Perez had provided false information to Hart in the course of an investigation. Connolly secured the telephone records of the private telephone connections at the Xerox complex. However, upon inquiry of the telephone company, Connolly learned that he would need a Grand Jury subpoena in order to gain the release of records for the public telephones. Connolly called Hart for approval and Hart directed him to secure the subpoena.

8. Hart testified that he had been in telephone contact with the Department Of Justice Office of Professional Responsibility ("DOJ OPR") throughout the week of February 2. The DOJ OPR becomes involved in both administrative and criminal investigations of high ranking FBI agents such as Perez. Hart testified without corroboration that the subject of his contacts were the failure of Perez to cooperate in the investigation, the underlying administrative investigations, and the possible vio-

lation of 18 U.S.C. § 1001. However, in Hart's voluminous report of his investigation of Perez, the report to John Glover recommending Perez's termination, and a later investigation of Hart's conduct during an investigation of Perez, *contain not one reference to investigation of Perez for violation of 18 U.S.C. Sec. 1001.* The absence is surprising considering that Hart's investigation reports demonstrate extreme attention to detail in every other matter.

9. S.A. Connolly contacted Assistant United States Attorney Justin Williams in Alexandria, Virginia, to secure a Grand Jury subpoena. Connolly did not inform Williams that he was investigating a violation of 18 U.S.C. Sec. 1001. No name was given to Williams of the person under investigation. Williams recalls that Connolly told him that the investigation involved an agent who had "perjured" himself or lied.[7]

10. Williams prepared and issued a subpoena in the name of the Grand Jury for Connolly. No report was made back to Williams or the Grand Jury subsequently as to the use made of the subpoena or the materials taken into Connolly's custody by the power of the subpoena.

11. Inspector Hart made use of the telephone records secured pursuant to the subpoena in his report recommending the termination of Perez as a Bureau Agent.

12. No indictments have been sought by the FBI or the United States Attorney for the Northern District of Virginia for violations of 18 U.S.C. § 1001.

13. The Grand Jury subpoena was discovered in an administrative investigation file by the United States Magistrate reviewing an *in camera* submission by the Government in response to the Discovery

---

6. "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry [is guilty of a felony]." 18 U.S.C. Sec. 1001.

This Court does not comment on whether, if proven, Hart's allegation that there was an

agreement for Perez to call him during a certain period, did not, then lied to Hart later about it, would constitute a violation of this section as a matter of law or fact.

7. In response to questioning by counsel for the Government in the hearing before this Court, Connolly, a 20 year veteran, stated that he sometimes used the term "perjury" to mean misstatements whether or not the statement was given in a civil or criminal proceeding under oath.

request of the Plaintiff Class in this litigation in April, 1988.[8]

14. The Court finds that the allegation of an 18 U.S.C. Sec. 1001 violation was an afterthought. The Grand Jury subpoena was not secured pursuant to an investigation of Perez for violation of 18 U.S.C. Sec. 1001. The telephone records secured under the subpoena were used by the FBI in the course of an administrative investigation of Perez without the knowledge of the United States Attorney who issued the subpoena on behalf of the Grand Jury, or the Grand Jury itself. At no time was permission of a United States District Judge to utilize the telephone records for purposes other than a criminal investigation sought by any person connected with the investigation of Perez.

15. No similarly energetic investigation of Bretzing was convened.

16. On January 10, 1987, Perez, on behalf of a class of Hispanic Special Agents filed a civil complaint for violation of Title VII of the Civil Rights Act.

17. The Court finds that the Defendant did not articulate a legitimate, non-retaliatory reason for securing the Grand Jury subpoena. The indisputable evidence is that no prosecutorial opinion was sought from the DOJ OPR or the United States Attorney at a time relevant to the administrative investigation or the securing of the Grand Jury subpoena, no report was ever made back to the U.S. Attorney or the Grand Jury, and the use of the information in the course of an administrative investigation. These elements together demonstrate that the securing of the Grand Jury subpoena was not legitimate.

18. If, for arguments sake, it is presumed that the Grand Jury subpoena was part of a legitimate effort to investigate violation of a criminal statute, the absence of any reference to 18 U.S.C. Sec. 1001 in the detailed investigatory records support this Court's finding that the articulated

reason was but a pretext for the purpose of retaliating against Perez for protected activity in violation of Title VII of the Civil Rights Act.

19. The Court finds that a subsequent formal investigation of Perez by the Department of Justice for violations of 18 U.S.C. Sec. 1001, after the date which the Magistrate discovered the Grand Jury subpoena in the administrative investigation file, is a pretext for prohibited reasons for securing the subpoena on February 4, 1987.

20. Utilization of the materials received by the FBI pursuant to the Grand Jury subpoena was a retaliatory act directly related to Perez's protected employment discrimination activities.

21. The charges leading to the administrative investigation were brought by a person who was named by Perez as a discriminating individual in prior EEO matters. Testimony received at the first part of the trial demonstrated that Bretzing was in constant communication while Perez was an agent in Los Angeles with the very persons who later directed the investigation of Perez for perjury. The civil complaint filed in this cause on January 10, four weeks prior to the date of the Grand Jury subpoena implicated the conduct of high ranking FBI officials; persons closely connected to the investigation of Perez. This Court concludes that the investigation implemented by Special Agent Hart would not have been conducted in the manner it was conducted but for Perez's activities relating to this litigation.

22. This Court, by previous Order, bifurcated the trial of this cause; the first part considering liability issues and the second part considering damages. The Findings of Fact this day supplement this Court's opinion, entered September 30, 1988 on the first part of the litigation.

*Conclusions of Law*

1. Section 704(a) Title VII of the Civil Rights Act prohibits retaliation against em-

---

8. Judge Reusch discussed the grand jury subpoena at a hearing which convened on Monday, April 4, 1988 and continued on April 5. In Judge Reusch's Discovery Order dated April 15, 1988 she states that the grand jury subpoena was contained in an administrative investigation file which considered whether criminal perjury charges should be brought against Perez for his testimony during the Miller espionage trials. Reusch Discovery Order, April 15, p. 8.

ployees for having "opposed any practice made an unlawful employment practice by this title" or for having "made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. Sec. 2000e–3(a).[9]

2. The proof of a claim of retaliation is similar to the "burden shifting pattern" associated with proof of disparate treatment. See *Whatley v. Metropolitan Atlanta Rapid Transit Authority*, 632 F.2d 1325 (5th Cir. Unit B 1980); *Smalley v. City of Eatonville*, 640 F.2d 765, 769 (5th Cir. Unit B March 1981); and *DeAnda v. St. Joseph Hospital*, 671 F.2d 850, 856 (5th Cir.1982). However, the Plaintiff/employee must demonstrate that his participation in the protected EEO activity and the adverse employment decision are related. In this Circuit, it is settled that the plaintiff must show that but for his participation in the grievance process the adverse action would not have occurred. *Jack v. Texaco Research Center*, 743 F.2d 1129, 1131 (5th Cir.1984).[10]

3. Rules governing the powers of a Grand Jury and the use of Grand Jury subpoena are set out in the Federal Rules of Criminal Procedure. The Grand Jury is an historical institution referred to by name in the Fifth Amendment to the Constitution. The federal Grand Jury is particularly well esteemed.[11] The most cogent summary of the two primary responsibilities of a Grand Jury was stated by Justice Powell in *U.S. v. Calandra:* (1) to determine whether there is probable cause to believe a crime has been committed; and (2) the protection of citizens against un-

founded criminal prosecutions. *U.S. v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974).

It is undisputed that the powers of a Grand Jury to investigate matters are very broad. At the outset of an investigation, the direction of the inquiry is often somewhat indistinct.[12] The Grand Jury deliberates in secret, may determine the course of its inquiry, and its deliberations are not restrained by the technical and procedural safeguards of Courts. See *U.S. v. Calandra*, 414 U.S. at 343–344, 94 S.Ct. at 617–618, 38 L.Ed.2d 561. This great latitude can be explained however by noting that the inquiry of the Grand Jury is not into the guilt or innocence of the person investigated; rather it is to determine whether there is probable cause to believe a crime has been committed. In practice, the second purpose is well served; the Grand Jury acts as a shield for citizens from arbitrary and oppressive governmental action. See e.g. *Ealy v. Littlejohn*, 569 F.2d 219, 226 (5th Cir.1978).

Though for the purposes of efficiency and order, a United States Attorney may utilize the investigatory powers of the Grand Jury by authorizing preliminary investigation in the name of the Grand Jury without actual authorization of the citizens who make up that body, this practice is subject to the purposes of the Grand Jury. Other courts have noted that there is significant danger of abuse by members of the executive branch.[13] Of course, the Grand Jury itself is subject to the supervision of the Federal Courts to prevent abus-

---

**9.** See the discussion by the Court at page 73 et seq. of the September 30, 1988 Findings of Fact and Conclusions of Law.

**10.** In *Texaco Research Center*, the employee prevailed at District Court level when Court found that the EEO activity was one of the reasons for the discharge. However, the Fifth Circuit vacated and remanded requiring a showing that but for the protected activity, she would not have been discharged. 743 F.2d at 1131.

**11.** Judge Wisdom of this Circuit noted that "The Grand Jury earned its place in the Bill of Rights by its shield, not by its sword." *U.S. v. Cox*, 342 F.2d 167, 186 (5th Cir.1965) (Wisdom, J., con-

curring), cert. den'd 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700.

**12.** A particularly helpful discussion of the need for broad investigative powers by the Grand Jury is contained in *U.S. v. Doulin*, 538 F.2d 466, 469 (2nd Cir.1976) cert. den'd. 429 U.S. 895, 97 S.Ct. 256, 50 L.Ed.2d 178.

**13.** Note the independent nature of the Grand Jury as described by the Court in *Nixon v. Sirica*, 487 F.2d 700, 712 n. 54 (D.C.Cir.1973): the federal grand jury is a constitutional fixture in its own right, legally independent of the Executive.

es of its process or authority.[14]

The Supreme Court recognized that modern investigatory practices requires the prosecutor to be given great discretion to act in the name of the Grand Jury:

"[A] modern Grand Jury would be much less effective without the assistance of the prosecutor's office and the investigative resources it commands. The prosecutor ordinarily brings matters to the attention of the Grand Jury and gathers the evidence required for the jury's consideration. Although the Grand Jury may itself decide to investigate a matter or to seek certain evidence, it depends largely on the prosecutor's office to secure the evidence or witnesses it requires." *U.S. v. Sells Engineering Inc.,* 463 U.S. 418, 430, 103 S.Ct. 3133, 3141, 77 L.Ed.2d 743 (1983).

However, in the same opinion, the Supreme Court was emphatic that the use of Grand Jury materials by Government agencies in civil or administrative matters "threatens to subvert the limitations applied outside the Grand Jury context on the Government's powers of discovery and investigation." *Sells Engineering,* 463 U.S. at 433, 103 S.Ct. at 3142, 77 L.Ed.2d at 758. The Court noted the danger in providing to the Government a virtual "ex parte form of discovery." Id. Rule 6 of the Federal Rules of Criminal Procedure requires judicial supervision of the disclosure of Grand Jury materials to persons other than prosecutors or their agents in the course of closely related investigations.[15]

4. It is undisputed that no judicial review of the use of the telephone records secured by the use of the Grand Jury subpoena was sought. The manner in which the Grand Jury subpoena was secured took advantage of a close professional relationship between the investigative special agent and the United States Attorney. S.A. Connolly, acting on direct orders of S.A. Hart, abused the spirit and the letter of the safeguards of Rule 6(e) of the Federal Rules of Criminal Procedure. Hart's superiors adopted the misuse when they adopted the administrative report of September 25, 1988 recommending to John Glover the discharge of Perez.

5. To deny that there was not a close causal relationship between the Grand Jury subpoena and the filing of the Title VII complaint by Perez is to fly in the face of reason and suggest that the misuse of the Grand Jury subpoena is a routine manner of conducting administrative investigations. There was no additional evidence presented at the hearing that would support the conclusion that the FBI regularly utilizes Grand Jury subpoenas to investigate administrative matters. It is beyond the purview of this Court to inquire into matters beyond those acts which were found to constitute retaliation against Plaintiff Perez in this cause.

6. It is not significant to the issue of retaliation that the Assistant Director of the FBI declined to discharge Perez. It is not significant that Perez did not learn until a hearing before the United States Magistrate that a Grand Jury subpoena had been secured to investigate his statements to Inspector Hart. Nor is it significant that Perez did not learn until the trial in August, 1988 that on September 25, 1987 a recommendation was made to the Assistant Director to discharge Perez. These may work to mitigate the nature or amount of damages Perez sustained. The Court has reserved the issue of damages for a later time.

---

**14.** "The Powers of the Grand jury are not unlimited and are subject to the supervision of a judge...." *Branzburg v. Hayes* 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626 (1972).

**15.** Prior to 1977, Rule 6(e) of the Federal Rules of Criminal Procedure did not provide for access to grand jury materials by non-attorneys assisting Government attorneys. The amendment which permitted investigators from the FBI, IRS and other agencies as well as other persons with investigative skills was adopted reluctantly after much concern by Members of Congress that there be safeguards to protect persons against the use of grand jury materials for improper purposes by Government personnel. *U.S. v. Sells Engineering Inc.,* 463 U.S. at 438, 103 S.Ct. at 3145, 77 L.Ed.2d at 761 discussing legislative history of the relevant amendment to Rule 6(e).

## ON MOTION FOR PROTECTIVE ORDER

BEFORE THIS COURT are Plaintiffs' Motion for Protective Order and Defendants' Motion to Compel in the above-numbered civil cause. The subject of both Motions are Defendants' interrogatories and requests for production of documents relating to Plaintiffs' Motion for an award of Attorney's Fees as the prevailing party in a suit brought pursuant to Title VII of the Civil Rights Act by a class made up of Hispanic Special Agents in the Federal Bureau of Investigation.[1]

Upon review of the Record in this cause and the arguments of counsel, the Court is of the opinion that Plaintiffs' Motion for Protective Order should be granted in part and denied in part. Similarly, Defendants' Motion to Compel should be granted in part and denied in part.

### Interrogatories Numbered 1 Through 5

 Defendants request information regarding past employment by counsel on employment discrimination cases from January 1, 1984 to the present. Plaintiffs object that the request is overly broad and burdensome. Both parties state that the records of these matters are in the custody of other entities not party to this suit. Defendants counter that the information is required to appraise the reasonableness of the fee request.[2] Defendants specifically direct this Court to Plaintiffs' counsel's own arguments in support of the fee request and argue persuasively that the material sought in discovery is necessary to properly evaluate Plaintiffs' arguments. However, the Court is capable of separating the chaff from the wheat; where the Court prevents discovery the Court will discount the importance of this element, or Plaintiffs' counsel's self serving statements, in arriving at an appropriate award.[3]

With regard to interrogatory numbers 1 through 5, IT IS ORDERED that Plaintiffs need not identify the labor, employment or civil rights related matter for which any of

---

1. The Court, by Memorandum Opinion of Findings of Fact and Conclusions of Law on the liability stage of the bifurcated trial found *inter alia*, that the Defendant had engaged in a pattern and practice of discrimination on the basis of national origin of members of the Plaintiff class. September 30, 1988. (see page 897).

2. Defendants' argument in this regard relates to every item for which discovery is sought to be compelled. The Court, explicitly or implicitly will perform this balancing test—weighing the burdensome nature of the request to the strength of the relevancy of the material—with regard to every item sought to be protected.

3. The standard which governs the computation of attorney's fees in this circuit is set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). The criteria is as follows:

 (1) the time and labor required;
 (2) the novelty and the difficulty of the question involved;
 (3) the skill requisite to perform the legal service properly;
 (4) the preclusion of other employment due to the acceptance of the case;
 (5) the customary fee;
 (6) whether the fee is fixed or contingent;
 (7) the time limitation imposed by the client or the circumstances;
 (8) the amount involved and the result obtained;
 (9) the experience, reputation and ability of the attorneys;
 (10) the "undesirability" of the case;
 (11) the nature and length of the professional relationship with the client; and
 (12) awards in similar cases.

 The *Johnson* standard has been further refined by the Fifth Circuit's adoption of the "lodestar" method of calculating attorneys' fees. See *Graves v. Barnes*, 700 F.2d 220, 222 (5th Cir.1983). "The lodestar is equal to the number of hours reasonably expended multiplied by the prevailing hourly rate in the community for similar work. The lodestar is then adjusted to reflect other factors such as the contingent nature of the suit and the quality of the representation."

 It is well established that the Court is empowered to exercise its informal discretion in awarding attorneys' fees. *Greenhaw v. Lubbock County Beverage Association*, 721 F.2d 1019 (5th Cir.1983); *Graves v. Barnes*, 700 F.2d 220 (5th Cir.1983). In arriving at the appropriate amount, district courts must "explain the findings and reasons upon which the award is based, including an indication of how each of the twelve factors in *Johnson* affected his (or her) decision." *Copper Liquor, Inc. v. Adolph Coors Company*, 624 F.2d 575, 581 (5th Cir. 1982), quoting *Matter of First Colonial Corp. of America*, 544 F.2d 1291, 1300 (5th Cir.1978), cert. denied, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977).

Plaintiffs' counsel has received payment for work done since January 1, 1984.

### Interrogatory Number 6

■ Interrogatory 6 asks Plaintiff to identify those clients which were allegedly lost, whether the client was current or prospective, the type of matter involved, and the fee basis on which the lawyer would have handled the matter. Because the request is broad, the whole element of consideration somewhat secondary to this Court's analysis, and in the interests of economy, the Court is of the opinion that the Motion for Protective Order is meritorious. Accordingly, IT IS ORDERED that Plaintiffs need not respond to Interrogatory Number 6.

Interrogatory number 11, for which Plaintiff seeks protection has been withdrawn by Defendants.

### Interrogatories 12 and 13

Defendants move to compel additional discovery of Plaintiffs' counsel seeking more detailed records in support of Plaintiffs' request for attorneys fees. The sufficiency of Plaintiffs' response to Defendants in discovery and to this Court in their affidavits in support of their request for fees will shortly be a matter for this Court's determination. Plaintiffs may supplement their answers to Defendants in a timely manner or rely on the showing they have made thusfar. Similarly, Defendants have preserved for appellate review should it become necessary their objections to the sufficiency of Plaintiffs' counsel's record keeping. The Court declines to compel further production of Plaintiffs in this area reserving to a later time ruling on the appropriateness or amount of an award.

### Interrogatory Number 14

■ Interrogatory Number 14 requests Plaintiffs to "identify separately all time spent by counsel relating to the subjects of retaliation, discipline, religion, intervention, and sanctions." Plaintiffs argue *inter alia* that there is a common nucleus of facts which gave rise to the allegations and that the findings of this Court relating to the pattern and practice of discrimination within the FBI encompass the great majority of the legal and factual inquiry which occupied Plaintiffs' counsel in preparation for trial.

The Court anticipates that conflict between parties on entitlement to attorney fees will be most heated on this issue. The Court is inclined to concur with the proposition that corresponding time spent on legal or factual investigation with each issue which forms the basis of Plaintiffs' original complaint is somewhat artificial and unreasonable. If the legal and factual assertions of the Plaintiffs are capable of severance one from another, the interrogatory fashioned by Defendants is not designed to elicit information which is relevant to this Court's resolution of this dilemma. Because the request is burdensome and unlikely to lead to the discovery of information of much probative worth, the Court is inclined to grant Plaintiff's protection. Defendants and Plaintiffs will have leave to suggest alternate methods of resolving this matter without reference to artificial differentiation of Plaintiffs' time records.[4]

Accordingly, IT IS ORDERED that Plaintiffs are protected from responding to Interrogatory Number 14.

### Interrogatory Number 18

Defendants request the purpose and means of travel and transportation by Plaintiffs counsel. It is a reasonable request. However, Defendants have stated to the Court that it withdraws its request.[5]

### Requests for Production

Where the requests for production relate to the Court's disposition of an Interrog-

---

4. If Defendants' counsel is willing to present detailed time records to the Court corresponding *Defendants' counsel's* time spent in legal and factual investigation to Plaintiffs' complaint, they are not prevented from doing so. Such a presentation may be revealing not only on the issue of proportion of time spent on the various allegations contained in Plaintiffs' complaint but also on the issue of the very amount of time spent on the entire defense of the case.

5. See footnote 4 of Defendants' Motion to Compel and For Enlargement of time.

atory, counsel should extend the ruling of this Court to the production of documents. Where the Defendants have moved to compel production[6] of materials which have not been resolved by the Court's rulings this day, Plaintiffs are directed to respond and SHOW CAUSE as to why Defendant's Motion to Compel should not be granted in these regards within 10 days. Defendants are invited to advise the Court and opposing counsel by letter what matters remain for further resolution.

### *Motion for Enlargement of Time*

Defendants move for an additional 45 days after the production of additional records by Plaintiffs to review and incorporate the materials into their arguments.

The Court is of the opinion that the Motion for Enlargement of Time is not meritorious and should be Denied in part.

Defendants' response to Plaintiffs' Motion for an Award of Attorney Fees is due in this Court on March 1. Plaintiffs have an additional 10 days to respond and supplement their request.

---

**6.** Counsel are directed to page 18 et seq. of Defendants' Motion to Compel.